STATE OF NORTH CAROLINA v. GRANT DAWSON

No. 8017SC84

(Filed 5 August 1980)

Criminal Law § 89.10– cross-examination of defense witness – prior shoplifting incidents – no good faith basis for questions shown

In a prosecution for discharging a firearm into an occupied vehicle where defendant's entire defense was built on misidentification and alibi, the prosecutor's asking six questions of defendant's mother concerning prior shoplifting by her was highly prejudicial to defendant in that it tended to destroy by innuendo and suspicion the otherwise unimpeached evidence that defendant was at home when the shooting took place elsewhere, and, since there was no showing that the prosecutor had a good faith basis for asking the questions, the cross-examination was improper.

APPEAL by defendant from *Long, Judge*. Judgment entered 9 August 1979 in Superior Court, ROCKINGHAM County. Heard in the Court of Appeals on 3 June 1980.

In a bill of indictment proper in form, defendant was charged with discharging a firearm into an occupied vehicle, a felony and a violation of G.S. § 14-34.1. At the ensuing trial, evidence for the State tended to show the following:

Around 10:00 p.m. on 18 August 1978, Donald W. Cox took four of his friends for a ride in his jeep on the Duke Power right of way in Eden. As they came off the dirt right of way and proceeded up Maplewood Drive, a creamy yellow station wagon approached them. Its bright lights were burning. Cox slowed down and found that he "had to go out of the road to go around" the car, because the car was "sideways" in the road. He "knocked" the jeep into neutral to see what was going on. There were two people in the station wagon. As Cox started to go around, the person on the passenger side jumped out, ran to the back of the car, and said, "Stop or I will shoot." Neither Cox nor any of

his companions answered. The person fired a shot. Cox put the jeep back in gear, "floorboarded it" and "got out of there." The person fired three more shots in rapid succession. The jeep was struck in three places. Fragments from one of the shots hit one of the passengers, but no one was injured.

A few minutes later, the station wagon came up behind the jeep, followed it for a while, then passed and subsequently turned off to the right, and was gone. There was only one person in the car at that time, and he was the same person who had fired the shots. He drove at a normal rate of speed and made no attempts to stop the jeep or to communicate with anyone in the jeep.

At the time of the incident, Cox did not know who the person firing the shots was and had never seen him before. In court, Cox identified the defendant as the perpetrator. Cox testified that one of his companions, Tim McCrickard, said shortly after the shooting that he thought he knew who the assailant was, that "it was one of the Dawson brothers, the oldest one but he did not know the guy's first name . . . . " The group went to the Pizza Hut, and McCrickard went inside "to find out the guy's first name." When he came back, he said it was Grant Dawson, the defendant. They then went to the police station, and Cox took out a warrant for Grant Dawson's arrest. He described the assailant as being "tall and slim, having a full beard and a mole . . . on the left side" of his face. Defendant has a mole on the left side of his face. At the time of the shooting incident, he had a mustache and a full beard. At the time of trial he had only a mustache. Cox said he did not know why the defendant shot at him, nor did he know of any reason the defendant might have had for doing such a thing.

Cox's four companions also testified for the State and in substance corroborated his testimony. Bonnie Ruthledge said she had a good view of the assailant, but did not know who he was at the time and had never seen him before. In court, she identified defendant as the person who fired the shots.

Suzanne DePriest and Rhonda Ruthledge testified to similar effect. They too, did not recognize the assailant at the time,

but in court identified defendant as the perpetrator. "There is no question in my mind about that," both said.

Tim McCrickard described the incident in identical fashion. He said he did not know the defendant personally, but "had seen him right much. . . . I knew his brothers." McCrickard said he knew the defendant by sight because he [McCrickard] had worked at the Jan Stand car wash and service station, and the Dawson family "bought a lot of gasoline down there. . . . I have been seeing him or members of his family off and on for several years."

McCrickard testified further that Grant Dawson was the person "who did the shooting" and that the incident occurred two or three houses down from the Dawson residence.

The defendant's evidence tended to prove that defendant was at home with his family at the time of the shooting. The defendant, 24 years old at the time of trial, testified that he is the oldest of four brothers and that he attended college at Baldwin Wallace College in Berea, Ohio. During the summer of 1978, he was employed as a live-in counselor at Camp Saurakee in Wentworth, North Carolina, where he was in charge of 16 retarded children and adults. On 18 August 1978, a Friday, he was at home and had been in bed most of the week because of a back injury he had suffered the previous Monday. From approximately 7:30 p.m. until approximately 11:10 p.m. when police officers came to arrest him pursuant to the warrant secured by Cox, defendant remained in his parents' bedroom watching television. His father and his brother Scott were with him.

Defendant testified further that he owns and drives a 1974 Plymouth. His mother owns a station wagon to which only she and his father have keys and which she drives most of the time. Defendant said he did not know any of the State's witnesses, nor had he ever seen them prior to the preliminary hearing in the case. He denied leaving home for any reason after 5:00 p.m. on 18 August 1978.

Defendant's three brothers corroborated his testimony that he was home all evening on the night in question. His twin

brothers Blake and Scott, 18 years old at the time, were loading a U-Haul in the front driveway until about 8:30 or 9:00 that night and would have seen anyone leave the house from either the front or back doors. Blake testified that he observed the defendant watching television in their parents' bedroom several times that evening, that defendant was still in the bedroom after 10:00 p.m., and that he [defendant] "could not have left that house without me seeing him." Scott testified that from about 8:30 p.m. until the police officers arrived, he was in the master bedroom watching television with the defendant and their father, and that the defendant "did not leave the room before the officers arrived."

The defendant's mother testified that she owns a "Chrysler New York station wagon which is an off-white beige." On 18 August 1978 she drove the station wagon most of the day, picking up furniture. She returned home around 6:30 or 7:00 p.m. and was outside helping her sons, Blake and Scott, to load the furniture into the U-Haul "the whole time." They also loaded about ten cans of paint into the rear of the station wagon which had been backed into the driveway and parked next to the U-Haul while the loading was in progress. Her son Grant was at home all day. She saw him several times during the day and at 9:30 that night observed him in the master bedroom watching television. After 9:30 she was in the kitchen. She said that their house was "so built that I know that Grant was in the bedroom as you can't leave the master bedroom without coming down the hall, . . . there is no other way to go except by where I was." Grant did not leave, according to Mrs. Dawson, nor were any of their cars, including the station wagon, driven away from the house after 6:30 p.m., although the cars were "shifted" around after the loading of the U-Haul was completed. When the defendant was arrested, she and her husband drove to the police station in the defendant's Plymouth since the station wagon was "loaded."

The defendant's father, Dr. Shelton Dawson, a physician specializing in pediatrics, substantiated the testimony that his son Grant was home the entire evening of 18 August 1978 up to the time he was arrested. He and Grant watched television together in the master bedroom from about 8:00 p.m. Dr. Daw-

son stated, "From the time that he came back into the master bedroom until the time that the officers came to the door, Grant was in the master bedroom all of the time and did not get out of my sight."

Defendant also offered the testimony of Dr. Alfred B. Bonds, Jr., president of Baldwin Wallace College, who stated that the defendant "has an excellent reputation ... at our college." Two other witnesses also testified as to the defendant's good character.

Any additional evidence pertinent to the decision in this case will be discussed in the opinion to follow.

The jury found the defendant guilty as charged. From a judgment imposing a prison sentence of six months, the defendant appealed.

*Attorney General Edmisten, by Associate Attorney Grayson G. Kelley and Assistant Attorney General Dennis P. Myers, for the State.*

*Bethea, Robinson, Moore & Sands, by Norwood E. Robinson; and Tharrington, Smith & Hargrove, by Wade M. Smith, for the defendant appellant.*

HEDRICK, Judge.

Our disposition of defendant's ninth and tenth assignments of error makes it unnecessary for us to discuss his remaining arguments on appeal. We conclude that the prosecutor impermissibly harassed a key defense witness on a collateral matter such as to destroy the witness's credibility on the critical issues involved in the case with neither a concrete showing nor an inference raised by the circumstances that he was acting in good faith. In refusing to restrain the prosecutor's conduct or at least to require that the prosecutor demonstrate legitimate grounds for his harassment, the trial judge committed prejudicial error which deprived the defendant of his constitutionally guaranteed right to a fair trial. For this reason the defendant is entitled to a new trial.

The error obtains in the following colloquy which occurred between the prosecutor and the defendant's mother on cross-examination, to which defense counsel to no avail "vigorously" and repeatedly objected:

Q. Have you on any occasion or occasions shoplifted?

MR. ROBINSON: OBJECTION.

A. No, I was not.

Q. Do you know what I am talking about?

A. I assume by shoplifting you mean stealing.

Q. Do you often —

MR. ROBINSON: OBJECTION to the question.

COURT: OVERRULED.

. . .

Q. Have you at any time or times picked up things from Mann's Drug Store without paying for them?

MR. ROBINSON: OBJECTION.

COURT: OVERRULED.

A. They have been charged, no, I never picked up anything without paying for them.

Q. I will ask if you carried them home, left the store without paying for them?

MR. ROBINSON: OBJECTION.

COURT: OVERRULED.

A. They had been charged to the account.

Q. Without saying anything to anybody about it?

A. Not that I know of.

Q. And that if some of the articles were not returned?

A. I have never stolen anything in my life.

Q. No further questions.

COURT: Members of the jury, you may not consider the implication of the question.

We recognize that, for purposes of impeachment, a witness may be cross-examined by the asking of "disparaging questions concerning collateral matters relating to his criminal and degrading conduct." *State v. Williams*, 279 N.C. 663, 675, 185 S.E. 2d 174, 181 (1971). *Cf. State v. Purcell*, 296 N.C. 728, 252 S.E. 2d 772 (1979) (clarifying the rule that the questions must concern *particular* acts of misconduct.) However, such cross-examination is limited by the requirement that the questions be asked in good faith. *See, e.g., State v. Purcell, supra; State v. Spaulding*, 288 N.C. 397, 219 S.E. 2d 178 (1975) (stating the rule), *death sentence vacated*, 428 U.S. 904, 96 S. Ct. 3210, 49 L. Ed. 2d 1210 (1976); *State v. Lowery*, 286 N.C. 698, 213 S.E. 2d 255 (1975), *death sentence vacated*, 428 U.S. 902, 96 S. Ct. 3203, 49 L. Ed. 2d 1206 (1976); *State v. Ross*, 275 N.C. 550, 169 S.E. 2d 875 (1969), *cert. denied*, 397 U.S. 1050, 90 S. Ct. 1387, 25 L. Ed. 2d 665 (1970). This means simply that the questions must be grounded in fact. The prosecutor may not "inject into the trial of a cause to the prejudice of the accused by argument or by insinuating questions supposed facts of which there is no evidence." *State v. Phillips*, 240 N.C. 516, 524, 82 S.E. 2d 762, 767 (1954). Nor may he "needlessly badger or humiliate" the witness by asking insulting or impertinent questions which he knows will not elicit competent or relevant evidence. *State v. Daye*, 281 N.C. 592, 596, 189 S.E. 2d 481, 483 (1972).

Nowhere in the record before us does any basis for this attack on this witness appear. If it appears at all that the

prosecutor had a basis for asking these questions, it appears solely from the asking, and therein lies the problem with the court's refusal to require a showing that the questions were asked in good faith. Implicit in the asking is the accusation and appearance of guilt, as well as the impression that the prosecutor "had knowledge of evidential facts sufficient to support these insinuations." *State v. Foster*, 284 N.C. 259, 283-84, 200 S.E. 2d 782, 799 (1973) (Chief Justice Bobbitt dissenting). *See also State v. Phillips, supra*. Obviously, the witness's credibility already was inherently suspect by virtue of her relationship to the defendant. In our opinion, in his persistence and despite Mrs. Dawson's protestations to the contrary, the prosecutor succeeded through these questions in totally destroying her testimony by portraying her to be a thief. The portrayal, as far as we can tell, was baseless. Under the circumstances disclosed by this record, we think deference to the dictates of fair play and constitutionally administered justice at a minimum mandated the judge to ascertain whether the prosecutor did have grounds for asking the questions. A simple bench conference should have been sufficient. If the judge was unwilling to test the prosecutor's good faith or if a test revealed no basis for such harrassment, then the judge should not have permitted the questions to continue. Defense counsel's objections to their asking should have been sustained.

Moreover, under the circumstances present in this case, we think it plain that the judge's admonition to the jury to disregard the "implication of the question" came far too late and was too ambiguous to erase the error. At that point, Mrs. Dawson had been asked at least six questions regarding her "shoplifting" activities. Had the instruction been given after only one such question, we doubtless would have found it adequate to cure the impropriety. However, coming as late as it did, after the prosecutor had indicated he was finished with the witness, and being phrased in the singular as it was, the admonition in our opinion was wholly ineffectual.

In holding as we do in this case, we emphasize the fact

State v. Dawson

that this witness was crucial to the defendant's defense. She supported his alibi with the critical assertion that he could not have left the house at any time from approximately 6:30 p.m. on without her seeing his departure. She explained why the station wagon was parked in the place it was when the police officers arrived — that is, it had been moved out and parked behind the other cars in the driveway, which gave the appearance that it had arrived last, simply because it was to be driven out of town early the next morning to transport paint and to pull the U-Haul to some rental property owned by the family. She corroborated the defendant's testimony that he was dressed in a green "scrub suit" all evening, as opposed to the jeans and t-shirt described by the prosecuting witnesses, until he changed to go to the police station. The fair assessment of her credibility by the jury was perhaps pivotal. Yet, as we noted earlier, her credibility from the outset was innately weak because she was the defendant's mother. Furthermore, the question of the identification of defendant as the assailant was critical to the State's case in view of the fact that none of the State's witnesses personally knew the defendant, and four of the five persons in the jeep had never seen him before, nor did they recognize him at the time. The incident occurred at night. The other witness, McCrickard, stated only that he *thought* he knew who the assailant was. In short, the defendant's whole defense was built on misidentification and alibi. Under the circumstances, the asking of these six questions by the prosecutor was highly prejudicial to the defendant in that it tended to destroy by innuendo and suspicion the otherwise unimpeached evidence that Grant Dawson was at home when the shooting took place. Since the record fails to show that the prosecutor had a good faith basis for asking the questions, the cross-examination was improper.

The defendant is entitled to a new trial, and it is so ordered.

New trial.

Judges PARKER and VAUGHN concur.