OPINION OF THE COURT
Fuchsberg, J.
On this appeal from an order upholding a conviction in a criminal case,[1] we are called upon to decide, inter alia, whether the trial court should have denied a motion to dismiss the indictment when the District Attorney, at the time he presented the case to the Grand Jury, was also counsel to and a stockholder of the corporation in the course of whose management the defendant is alleged to have committed the "white collar” crimes with which he was charged. We believe the motion should have been granted.
The facts that govern our conclusion are neither complicated nor disputed. Defendant, Graeme Zimmer, organized and managed a business in rural Hamilton County which, while corporate in form, essentially was run as a one-man enterprise. The corporation bore his surname, being ¡entitled Zimmer, Inc. For a long time, by what appears to have been at least silent acquiescence of the other investors, no reins were placed on his managerial conduct, or, if they were, they were not enforced. During his regime, no stockholders’ meetings were ever held and when, midst a corporate financial crisis in the spring of 1977, he elected to surrender his corporate holdings and resign, it had been nearly 10 years since the directors had met. Soon after his departure, dissatisfied stockholders of this now teetering business took control of *393 its affairs. By July of that year, among other steps they had taken was to retain the incumbent District Attorney of Hamilton County as the corporation’s counsel.[2] The District Attorney was also a stockholder of record.[3]
Three months later, in October, 1977, the District Attorney, who at all times relevant to this prosecution continued to be corporate counsel and stockholder, personally procured a multicount indictment against the defendant and, in the following year, tried the case against him. All the counts in the indictment related to the defendant’s dealings with or for the Zimmer corporation or its stockholders.
As his primary point, the defendant asserts that the District Attorney’s involvement with the corporation disqualified him from representing the People at all stages of this matter and that, therefore, the denial of motions to dismiss the indictment, made both prior to and at the time of trial, was grievous error. Resisting the thrust of this contention, the position of the People in effect is that, absent demonstrative instances of "overzealousness, or overreaching attributable to the prosecutor’s role”, of which they insist there are none here, a "facial appearance of professional impropriety” would not constitute an impermissible imposition on defendant’s entitlement to fundamental fairness.
Central to the issue so sharply drawn is the pivotal point at which a public prosecutor stands in the criminal justice system. Unlike other participants in the traditional common-law adversarial process, whose more singular function is to protect and advance the rights of one side, a District Attorney carries an additional and more sensitive burden. It is not enough for him to be intent on the prosecution of his case. Granted that his paramount obligation is to the public, he must never lose sight of the fact that a defendant, as an integral member of the body politic, is entitled to a full measure of fairness. Put another way, his mission is not so much to convict as it is to achieve a just result (Berger v United States, 295 US 78, 88; People v Petrucelli, 44 AD2d 58, 59; Code of Professional Responsibility, EC 7-15).
*394 These are more than noble sentiments. In large part to enable a public prosecutor to carry out his heavy responsibility in a fair and impartial manner, we and, increasingly, other nations (see Goldstein & Marcus, Myth of Judicial Supervision in Three "Inquisitorial” Systems: France, Italy and Germany, 87 Yale LJ 240), have come to grant the office wide latitude in the allocation of its resources. Not the least feature of this flexibility is a discretion to investigate, initiate, prosecute and discontinue broad enough, conceptually and practically, to merit the observation that, overall, more control over individuals’ liberty and reputation may thus be vested than in perhaps any other public official (Ganger v Peyton, 379 F2d 709, 712; Note, Prosecutor’s Discretion, 103 U of Pa L Rev 1057; Freedman, Professional Responsibility of the Prosecuting Attorney, 55 Georgetown L Rev 1030, 1037).
For example, almost invariably it is the prosecutor who decides whether a case is to be pressed or dropped and what the nature of the specific offense ór offenses. to be lodged against a defendant is to be.[4] As a vital partner in the plea bargaining process or via his sentencing input (e.g., Penal Law, § 65.00), he heavily influences the sanction meted out. (See, generally, Report of the President’s Comm on Law Enforcement and the Administration of Justice, The Challenge of Crime In a Free Society, 11, 12, 134-135; ABA Project on Standards for Criminal Justice, The Prosecution Function and the Defense Function [Approved Draft, 1971], p 7.) Of especial pertinence to the case before us now is "the crucial nature of the prosecutor’s role vis-á-vis the the Grand Jury” (People v Di Falco, 44 NY2d 482, 485).
It would be simplistic therefore to think of the impact of a prosecutor’s conflict of interest merely in terms of explicit instances of abuse. Even our thumbnail description of prosecutorial power is enough to indicate that resulting prejudice can at least as easily flow from an act of omission as from one of commission, from discretion withheld as from discretion exercised. In this context, whether abuse is express or implied may be difficult to determine. Suffice it to say that any presumption of impartiality tends to be undermined when there is a clear conflict of interest. Indeed, the judgmental nature of *395 much of a District Attorney’s conduct will put it beyond effective appellate review. And, no matter how firmly and conscientiously a District Attorney may steel himself against the intrusion of a competing and disqualifying interest, he never can be certain that he has succeeded in isolating himself from the inroads on his subconscious.
Thus, the practical impossibility of establishing that the conflict has worked to defendant’s disadvantage dictates the adoption of standards under which a reasonable potential for prejudice will suffice (Commonwealth v Dunlap, 233 Pa Super Ct 38, 43 [Hoffman, J., dissenting]; cf. People v Jones, 47 NY2d 409, 416-417). Nor is the gravity of that potential lessened because it may cut either or both of two ways, against a defendant or against the People,, toward each of whom the discharge of the District Attorney’s duties of course should be uninhibited by subjective influences.
The District Attorney in this case ran afoul of these standards. The conflict was plain. The corporation and its stockholders in effect were the complainants. The Hamilton Grand Jury investigation that culminated in the defendant’s indictment was precipitated, to quote the People’s brief, by “transactions which were revealed by the records of the corporation and stockholders”. Aside from his financial interest as a stockholder, as counsel to the corporation the District Attorney was its spokesman in legal matters, of which this was one. Assuming he intended to be as fair and objective as fair could be, in presenting this evidence where did his role as partisan corporate attorney end and where did that of nonpartisan District Attorney begin? At what point was he serving which of his two masters? To put the questions is to state the problem, a problem instinct with due process implications.
Moreover, even if the actuality or potentiality of prejudice were absent, what of the appearance of things (see Code of Professional Responsibility, Canon 9)? No matter the good faith and complete integrity of the District Attorney, under these circumstances what impression could the defendant have had of the fairness of a prosecution instituted by one with the personal and financial attachments of this prosecutor? Would it have been unreasonable for the defendant — or others — to doubt that the public officer, whose burden it was to screen the complaint for frivolousness and, if necessary, guide its destiny before the Grand Jury, would do so disinterestedly?
*396 It was important that these responsibilities, carried out in the name of the State and under the color of the law, be conducted in a manner that fostered rather than discouraged public confidence in our government and the system of law to which it is dedicated. This concern, that those occupying prosecutorial office be jealous of the evidences as well as the substance of integrity, was not to be discounted. In particular, the District Attorney, as guardian of this public trust, should have abstained from an identification, in appearance as well as in fact, with more than one side of the controversy (People v Superior Ct. of Contra Costa County, 19 Cal 3d 255; State v Rosengard, 47 NJ 180; ABA Project on Standards for Criminal Justice, The Prosecution and the Defense Function, Part I [1.2] [(a)], [(b)]).
For all these reasons, it would have been better had the District Attorney recused himself. He having failed to do so, it was error to deny the motion to dismiss the indictment he obtained.[5] Accordingly, the order of the Appellate Division should be reversed and the indictment dismissed, without prejudice to an application for resubmission of the matter to the Grand Jury consistent with this opinion.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur.
Order reversed, etc.

. The affirmance, by the Appellate Division, Third Department, is without opinion.

. The District Attorney of a county having a population as small as that of Hamilton County, with certain exceptions not relevant here, may engage in the private practice of law (see County Law, § 700, subd 8).

. The District Attorney later was to advise the trial court that, though he was a stockholder of record, he regarded himself more as a creditor than as a stockholder. On our analysis, nothing turns on this distinction.

. The President’s Commission on Law Enforcement and the Administration of Justice reported that the charge is reduced in roughly two thirds of cases in many cities, usually by the District Attorney, and that the cases of roughly half of those arrested are dismissed early on (see Ganger v Peyton, 379 F2d 709, 712, supra).

. In light of this disposition, we have no occasion to reach the other issues raised by the defendant.