525 So.2d 789 (1988)
Billy HOSFORD
v.
STATE of Mississippi.
No. 57567.
Supreme Court of Mississippi.
April 27, 1988.
Richard W. Hamilton, Pascagoula, for appellant.
Edwin Lloyd Pittman and Mike Moore, Attys. Gen. by Leyser Q. Morris, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and PRATHER and SULLIVAN, JJ.
HAWKINS, Presiding Justice, for the Court:
Billy Hosford appeals from his conviction of sexual battery of felonious sexual penetration of a child under twelve years of age, and sentence to thirty years in prison.
We reverse Hosford's conviction because of the erroneous admission of inflammatory irrelevant evidence and prosecutorial *790 misconduct. Of necessity, we also address the responsibility of the trial judge to see that his court has adequate facilities to conduct a trial.

FACTS
Hosford was indicted by the Greene County grand jury on December 10, 1985, for the felonious sexual penetration of Anna Woodall, a child under twelve years of age on June 16, 1985, in violation of Miss. Code Ann. §§ 97-3-95 and 97-3-97. Anna was born September 27, 1976, and was eight years old at the time.
Mrs. Sheila Hosford had four children by a previous marriage, and she and Hosford had one child. On Sunday, June 16, 1985, Hosford and Mrs. Hosford and their children spent the afternoon on a picnic with Jerry and Alice Woodall, two of their children, Anna and Kimberly, and Stacy Webb, a twelve-year-old who lived with her father in Birmingham.
When the frolic was over, Anna and Kimberly and Stacy Webb wanted to spend the night with Tabitha and Angela Duiett at the Hosfords. The parents agreed. Two of the Hosfords' children stayed overnight with the Woodalls.
The Hosfords lived in a trailer with two bedrooms. The air conditioner in the back bedroom was not functioning on that warm night, so Hosford and Mrs. Hosford and all six children spent the night in the living room where there was a bed and couch. Anna slept on the bed.
When she got her children the next day, Mrs. Woodall was told by Anna that Hosford had engaged in cunnilingus with her the night before while they were in bed.
Following his trial on March 24, 1986, the jury returned a verdict of guilty, and Hosford has appealed.

LAW
We have examined the record and concluded that, while factually weak, a jury issue was made on Hosford's guilt. We recognize that in cases of this nature, when the prosecuting witness is of tender years and must testify on the most intensely personal matter a child could be called upon to relate under circumstances that would be extremely difficult even for an adult, that the State is faced with what at times must appear an insuperable burden.[1] Constitutional due process absolutely requires, however, that credible evidence subject to cross-examination be adduced before a court and jury before any accused can be convicted of a crime. Neither the State nor this Court is at liberty to change this.

ANNA'S STATEMENTS TO HER MOTHER
Hosford complains of Anna's statements to her mother on Monday when Mrs. Woodall picked her up, and on Tuesday when she told her what Mrs. Hosford had said to Hosford when he was molesting her. Because we are reversing this case for a new trial on other grounds, we do not address this assignment of error. Upon retrial the circuit judge should carefully evaluate the Tuesday statement by Anna to her mother and determine whether it is competent and admissible.

PREJUDICIAL EVIDENCE AND PROSECUTORIAL MISCONDUCT
Over strong objection and protest by defense counsel the State's attorney cross-examined Hosford about his physical abuse of Mrs. Hosford, and complaints made in Youth Court and with the county welfare department about his mistreatment of his stepchildren and Mrs. Hosford. Mrs. Hosford was also asked if Hosford had physically abused her, and about her complaints to the welfare department of physical abuse by her husband to her and the children. Then, in rebuttal the State offered Reece McCoy, an employee of the county welfare department who investigated child abuse matters. Over defense objection he was permitted to testify that his office had *791 investigated and made two reports on violence in the Hosford family. The circuit judge did, however, refuse to permit the State to ask McCoy the details of the reports. This particular line of questioning dealt with alleged acts of violence of Hosford towards his wife and stepchildren, none intimating sexual conduct.
Again, over the objection of the defense, the State asked the following series of questions of Hosford:
A. I haven't fooled with nobody.
Q. You haven't fooled with nobody?
A. No, sir.
Q. You haven't fooled with Tabitha?
A. No, sir.
Q. You haven't fooled with Richard?
A. No, sir.
Q. You haven't fooled with Crystal?
A. No, sir.
Q. You haven't fooled with Angela?
A. No, sir.
Q. You have never made Tabitha place her mouth on your penis?
A. No, sir.
Q. Never?
A. Never.
Q. So if she were to come in this courtroom and tell this jury that you made her do it, that would be a lie, too?
The State had made no effort during the presentation of its case in chief to present evidence of Hosford's violence toward his own family, or acts of sexual, deviant conduct with his stepchildren.
We first note that the State was obligated to present all relevant evidence bearing upon Hosford's guilt as part of its case in chief, not initially through cross-examination of the defendant and his witnesses, and then offering evidence of such conduct in rebuttal. In Roney v. State, 167 Miss. 827, 150 So. 774 (1933), we held:
[I]t is the general rule in this state, as elsewhere, that the party who has the burden of proof, and the duty to open the case, must in his opening, and before he rests in his proof, introduce all the substantive evidence upon which he relies to establish his demand, and the extent of that demand....
167 Miss. at 830, 150 So. at 775. We further stated that it was only when it was necessary "that justice may be done," that the rule be relaxed. We then laid down the following rule:
[S]o it is that appellate courts do not attempt to lay down precise rules for the control of the discretion of the trial courts in this matter, else the discretion would be unduly limited and hampered; but there is a rule which will be found of substantial aid in this connection, and while obviously not at all inclusive of all cases, it will cover most cases. That rule is that when the question is not free from doubt whether the evidence offered in rebuttal is that which belongs to the evidence in chief, or whether it is rebuttal evidence proper, the court should resolve the doubt in favor of the reception in rebuttal where (1) its reception will not consume so much additional time as to give an undue weight in practical probative force to the evidence so received in rebuttal, and (2) the opposite party would be substantially as well prepared to meet it by surrebuttal as if the testimony had been offered in chief, and (3) the opposite party upon request therefor is given the opportunity to reply by surrebuttal. [Emphasis added]
167 Miss. at 831-32, 150 So. at 775-76.
Clearly, this rule requires that there be some doubt as to whether the proposed evidence is properly a part of the case in chief or rebuttal. It is only in such doubtful cases that it should be permitted. Manifestly, no party should be permitted as a deliberate trial tactic to decide in advance of trial to withhold a part of his case in chief, but instead attempt to suggest such evidence in cross-examination of the witnesses for the opposing side, and then offer the evidence in rebuttal. See: People v. Crump, 5 Ill.2d 251, 125 N.E.2d 615, 623 (1955).
Moreover, evidence of Hosford's physical abuse of his wife or stepchildren was not simply procedural error, but was *792 also manifestly incompetent at any stage of the trial proceedings. It was evidence of other misconduct which had no probative value on the issue before the jury, and which was inflammatory and extremely prejudicial. Neither at trial nor on appeal has the State suggested a plausible excuse for this line of questioning.[2]
Turning to the State's cross-examination of Hosford about acts of deviant, sexual conduct with his stepchildren, we again note that if the State had possessed any evidence of such misconduct and deemed it relevant to the issue of his guilt, it was under a duty to make profert of it as part of its case in chief. Roney v. State, supra. At that time its competency, which we do not deem necessary to address on this appeal, could have been tested. Profert could have been made to the court in chambers without inflaming the jury. If the court had determined such evidence admissible, it would have been proper for the State to offer what proof it had, and when Hosford and other defense witnesses took the stand, to cross-examine them fully and at length as to any such conduct. This salutary procedure was ignored. In the absence of some showing of necessity under the guidelines of Roney v. State, supra, it was reversible error to permit the State to present its case in this manner.
The error was egregiously compounded by the fact that the State, insofar as this record shows, had no evidentiary basis to ask such questions. Wide latitude should be given in the cross-examination of witnesses, but basic fairness requires that before the State asks questions to the accused directed to whether he is guilty of a series of totally different crimes, it have some basis in fact to ask them. This would be the case even if commission of such crimes were admissible evidence before a jury. Even though the defense objection was sustained, the State's conduct in asking these questions constituted reversible error.
The prosecuting attorney as a representative of the State has an obligation to be fair in his prosecution. This is an obligation he can fulfill without relaxing his solemn duty to vigorously prosecute. In Adams v. State, 202 Miss. 68, 30 So.2d 593 (1947), we stated:
The very nature of his functions as a prosecutor necessitates that the district attorney be a partisan in the case. Zeal in the prosecution of criminal cases is a praiseworthy and commendable trait in such an officer, and not to be condemned by anyone. A fearless and earnest prosecuting attorney, within the limitations upon his powers and prerogatives, is a bulwark to the peace, safety and happiness of the people. "If convinced of the defendant's guilt, he should, in an honorable way, use every power that he has to secure his conviction. At the same time, it is the duty of the prosecuting attorney, who represents all the people and has no responsibility except fairly to discharge his duty, to hold himself under proper restraint and avoid violent partisanship, partiality, and misconduct which may tend to deprive the defendant of the fair trial to which he is entitled, * * * It is the duty of the prosecutor to see that nothing but competent evidence is submitted to the jury; * * *" 42 Am.Jur., Sec. 20, p. 255. [Emphasis added]
202 Miss. at 75, 30 So.2d at 596.
We also stated in that case: "In conducting a criminal case, the prosecuting attorney must be fair and impartial, and see that defendant is not deprived of any constitutional or statutory right." [Emphasis original] 202 Miss. at 75; 30 So.2d at 596.
In DeGesualdo v. People, 147 Colo. 426, 432, 364 P.2d 374, 86 A.L.R.2nd 1435 (1961), the Colorado Supreme Court stated:
A district attorney, although in a sense a partisan, is a judicial officer sworn to uphold the constitution and obligated to refrain from invalid conduct creating an *793 atmosphere prejudicial to the substantial rights of the defendant. This and corollary principles governing his conduct have been reiterated repeatedly in numerous of our decisions.
86 A.L.R.2nd at 1441.
In Bennett v. Commonwealth, 234 Ky. 333, 28 S.W.2d 24 (1930), the Kentucky Court of Appeals noted:
It has been often written that a prosecuting attorney should act impartially and see that justice is fairly meted out, which requires fair dealing with an accused in calling him to account for his crime. It is his duty to see that the legal rights of the accused, as well as those of the commonwealth, are fully protected; to prosecute and not persecute; to conduct himself with due regard to the proprieties of the office. He represents the people of the state, and in a degree should look after the rights of a person accused of a crime by endeavoring to protect the innocent and seeing that truth and right shall prevail.
234 Ky. 336, 28 S.W.2d at 26.
And, in People v. Zimmer, 51 N.Y.2d 390, 434 N.Y.S.2d 206, 414 N.E.2d 705 (1980), the New York Court of Appeals held:
[U]nlike other participants in the traditional common-law adversarial process, whose more singular function is to protect and advance the rights of one side, a District Attorney carries an additional and more sensitive burden. It is not enough for him to be intent on the prosecution of his case. Granted that his paramount obligation is to the public, he must never lose sight of the fact that a defendant, as an integral member of the body politic, is entitled to a full measure of fairness. Put another way, his mission is not so much to convict as it is to achieve a just result [citations omitted].
These are more than noble sentiments. In large part to enable a public prosecutor to carry out his heavy responsibility in a fair and impartial manner, we and, increasingly, other nations (see Goldstein & Marcus, Myth of Judicial Supervision in Three "Inquisitorial" Systems: France, Italy and Germany, 87 Yale L.J. 240), have come to grant the office wide latitude in the allocation of its resources. Not the least feature of this flexibility is a discretion to investigate, initiate, prosecute and discontinue broad enough, conceptually and practically, to merit the observation that, overall, more control over individuals' liberty and reputation may thus be vested [in him] than in perhaps any other public official [citations omitted].
434 N.Y.S.2d at 207-208, 414 N.E.2d at 707.
In Nickolizak v. State, 75 Neb. 27, 105 N.W. 895 (1905), the Nebraska Supreme Court stated of the prosecuting attorney: "He should never let his zeal, or the temptation to obtain the glittering bauble of success, lead him to the employment of questionable or unfair methods for the purpose of securing a conviction." 105 N.W. at 897.
Regardless of the manner in which it comes about, prosecutorial misconduct which deprives an accused of a fair and impartial trial mandates reversal. See also: People v. Tufts, 167 Ca. 266, 139 P. 78 (1914); State v. Berry, 526 S.W.2d 92, 102 (Mo. App. 1975); 23A C.J.S. Criminal Law, § 1081; 63A Am.Jur.2nd, Prosecuting Attorneys §§ 26, 27; and cases cited; 45 A.L.R.2nd 299; 48 A.L.R.2nd 999; 52 A.L.R.2nd 834; 3 A.L.R.3rd 1448.
In State v. Dawson, 48 N.C. App. 99, 268 S.E.2d 572 (1980), the North Carolina court of appeals, while recognizing a rule in that state permitting cross-examination of a witness concerning collateral matters relating to his criminal and degrading conduct, nevertheless held, in reversing a conviction, that the question must be asked in "good faith." The court then defined "good faith":

[T]his means simply that the questions must be grounded in fact. The prosecutor may not "inject . .. to the prejudice of the accused by argument or by insinuating questions supposed facts of which there is no evidence [citation omitted]." [Emphasis added]
258 S.E.2d at 576. The witness in that case was the defendant's mother, and a crucial *794 witness in his defense. See also: People v. Perez, 58 Cal.2d 229, 23 Cal. Rptr. 569, 373 P.2d 617, 3 A.L.R.3rd 946 (1962).
It is highly improper for a prosecuting attorney in an opening statement to refer to matters incompetent as evidence, or which he does not attempt to prove. State v. Browner, 587 S.W.2d 948, 16 A.L.R.4th 795 (1979), and cases therein cited; State v. Berry, supra.
It follows that it is error to cross-examine the accused as to collateral matters which are inadmissible as evidence, or not part of the record. Nickolizak v. State, supra; People v. Crump, 5 Ill.2d 251, 125 N.E.2d 615, 624 (1955); People v. Santa Maria, 207 Cal. App.2d 306, 24 Cal. Rptr. 492 (1962); Brown v. State, 168 Tex.Cr.R. 67, 323 S.W.2d 954, 957 (1959); Hager v. State, 133 P. 263, 264 (Okla. Ct. App. 1913); as well as to accuse or insinuate that the accused is guilty of other crimes which he denies, and then make no attempt to prove them, State v. Glazer, 223 N.W. 769 (Minn. 1929) (reversing a conviction); State v. Beard, 74 Wash.2d 335, 444 P.2d 651 (1968).
The Texas court of criminal appeals in Brown v. State, supra, in reversing, stated:
In the language of a Kentucky court, "a litigant is entitled to at least one tolerably fair trial regardless of the nature of his offense, ... and to this end we have made our ruling." Shawhan v. Commonwealth, Ky., 318 S.W.2d 541, 544.
323 S.W.2d at 957.
In Hager v. State, supra, the Oklahoma criminal court of appeals held:
It is true that great latitude should be allowed attorneys in cross-examining witnesses, but their questions should not contain insulting insinuations and intimations that a defendant is guilty of some other crime... . The cross-examination in the case at bar is full of insinuations and intimations that appellant was guilty of a number of offenses, which could not be otherwise than prejudicial to appellant, and upon this ground alone the judgment of the trial court will be reversed and the cause remanded for a new trial. This court stands squarely for the doctrine of harmless error, but it is equally committed to the doctrine that fairness must prevail in the trial of criminal cases. We will not tolerate police court methods in courts of record. Trial courts should confine the cross-examination of witnesses to legitimate subjects of inquiry, and should not permit a witness to be brow-beaten or asked insulting questions.
133 P. 263 at 264.
In State v. Beard, supra, the Supreme Court of Washington, following a line of cases in that state, condemned an examination of the accused about prior convictions which the prosecution was unable or unwilling to prove upon the witness's denial. Nevertheless, because the defense had failed to interpose an objection at any time, and also because the proof of guilt of the defendants was conclusive, the Supreme Court affirmed. We must hold in a case of this nature, where the proof was by no means conclusive, that it was reversible error to ask Hosford about other odious conduct which insofar as this record reveals, had no basis in fact. It could have had no effect other than inflaming the jury.[3]

DISTRACTING NOISE
A highway runs alongside the court square in Leakesville, the county seat of Greene County. Defense counsel was not from Greene County and prior to trial was not familiar with this courthouse. During the course of the one-day trial there were over 35 interruptions because of loud, distracting noise made by passing trucks. Counsel and the circuit judge from time to time had to instruct a witness to withhold answering questions until the noise subsided. Hosford's counsel, after a number of interruptions, made a motion for a mistrial on account of the noise, which was overruled. *795 In overruling the motion, however, the circuit judge noted the seriousness of the problem. Thereafter, the court questioned a juror on the back row, who told him that he had trouble hearing the prosecution witness, "But I could read her lips." Another juror indicated he had not got all of the testimony.
Hosford assigned the distracting noise as one of the grounds for a new trial. A local attorney testified in support of this assignment. He said the interruptions in this trial would last at times for a matter of several minutes. In fact, during the hearing on this motion, the proceedings were interrupted three times because of the distracting noise. Defense counsel also informed the court that because of the distractions he could not concentrate and maintain his train of thought in examining witnesses.
Testimony and observations by the court at the hearing are revealing:
[EXAMINATION OF FRED DOBBINS, A LOCAL ATTORNEY, NOT CONNECTED WITH THE HOSFORD TRIAL]
BY MR. WRIGHT (DEFENSE COUNSEL):
Q. I think it would be well if you would for the record, Fred, would you describe this courtroom? That is as to the lay out, the height of the ceiling, the air condition or non-air condition?
A. Yes, sir. The Courtroom is an old courtroom, probably approaching around fifty (50) years of age; structurally sound, but the acoustics are terrible. There is no public address system in the courtroom. Air conditioning is non-existent. No fans exist in the courtroom. The only circulation in the courtroom is a series of windows along the south side of the courtroom, with no potential for cross-ventilation except 
BY THE COURT:
Describe those windows.
BY THE WITNESS:
The windows reach from the ceiling to approximately two and a half or three feet off the floor. They are probably 16 feet length by 4 feet width. There are 6 of them which go along the entire length of the courtroom. They open on the Main Street of the town of Leakesville through which all through traffic passes, as well as all local traffic. And the traffic exists [sic] to a large extent of heavy vehicles. We are situated in a timber related area, so there is a lot of heavy truck traffic right through the town of Leakesville approximately 50 to 65 feet from the windows of the courtroom.
* * * * * *
Q. Was it necessary that the windows be open? Do you recall?
A. I recall that the windows are [sic] open.
Q. In regard to the question that was asked you by the District Attorney, he used the phrase ineffectiveness. Would it have made you as an attorney feel that you were ineffective in assisting your client. I'm going to ask you this: Under the circumstances as described by you on that day of March 24th, would you have an opinion as to whether or not that might make an attorney less effective than he would be under normal circumstances?
A. Mr. Wright, I don't think there is any question it would make anyone in that environment less effective, including the Jurors, the Prosecuting Attorney, the Defense Attorney, the Judge, and whoever was participating.
Q. Okay. One other question in regard to a question that the District Attorney asked you. You said you had never brought this issue up by way of making a motion in the Court. But has it ever been discussed by you, or have you ever made complaints of any type to member of the Board, the Sheriff, or anyone?
A. Repeatedly.
* * * * * *
[EXAMINATION OF MR. HARKEY, DISTRICT ATTORNEY]
BY MR. WRIGHT:

*796 [T]o me it got to the point off where I know, and that's the reason I asked Mr. Dobbins that question, I know that I was less effective as an attorney that day just due to the fact that you can't possibly keep your train of thought going.
* * * * * *
BY THE COURT:
It's kinda useless. We go to great extent to insure that the accused's constitutional rights are observed. One of the requirements is that he has a right to confront his accusors [sic]. We make that plain to him that he has that right. And that is useless if he can't hear what his accusors [sic] say, which is close to what happened here in this trial... .
* * * * * *
BY THE COURT:
Well, Gentlemen, I appreciate your candor about the noise. It is something that bothers me. I don't know what the record will reflect when the Court Reporter transcribes her notes, how many times she will note in her record that it was impossible or difficult for her to hear the witnesses. And she sits right in front of the witnesses. I know it was difficult numerous times for her to hear. I stopped the proceedings on several occasions. I would say on an average, the case lasted six or seven hours and I would say that during the course of the trial an average of 25 or 30 times that the proceedings had to be stopped.
* * * * * *
BY THE COURT:
At one time you remember one of the Jurors told me he had difficulty hearing, but he thought he could read the lips of the witness and determine what the witness said. I don't think we should put that type of burden on our Jurors either. I don't know what to do. I don't know what the remedy is. As Mr. Dobbins said, we have repeatedly asked the officials for some help. And they have been just as pronounced in their response, telling us that they would love to do it but they don't have the money. And I'm convinced that they don't. I'm convinced of that due to the financial condition of the County. It's impossible for them to spend the money that it would take to correct this situation from what I know of the County. It's a problem that just didn't happen on that day. It is something that has increased through the years. I've been holding court here for better than 20 years and I would say it is an increasing problem. It gets worse almost every court term. And I would like to know what really we can do. Mr. Wright has suggested a change of venue. That may be one remedy. I've never known of that to be a reason for change of venue, but maybe it is. Maybe we could find other facilities away from the street; schools or things like that. But I don't know of any of those that would be available where we could try a case. I would be very reluctant because I think the Supreme Court has frowned upon Trial Judges exercising the inherent authority that the Courts may have, but I would like to have some direction in that regard to use the inherent authority of the Court to prode [sic] the officials of the Court. I think it could be done without the expenditure of too much funds to correct this situation. But I think if I did it, I would have to exercise some authority that I'm not sure that the Supreme Court has said that we have to make it necessary for the witnesses to be heard in this courtroom. But it is a serious problem. It concerns me. And I would love to have some direction from the Supreme Court on this point... .
Vol. II, pp. 168-178.
On appeal Hosford has likewise assigned the distracting noise as grounds for reversal. Because there is nothing to suggest this condition will not otherwise be corrected upon a retrial in Greene County, we address this assignment of error as well.
*797 It is a tribute to our State and our officials that this is the first case ever brought to the attention of this Court in which a court could be called upon to exercise its inherent authority to insure and preserve its own integrity. Over the decades of our State's existence, the Legislative branch and boards of supervisors have fulfilled their obligation by law to provide adequate facilities for our State's judiciary. They have honored legitimate requests.
Indeed, in this case this question comes before us in a rather back-handed way, not on appeal by a board of supervisors, sheriff, or county treasurer from a court order, but a circuit judge asking this Court for directions as to what he can or should do. Exercising our appellate function, we can only advise the trial court of its authority and its obligation upon retrial of this case.
Article 6, § 170 of our Constitution establishes a board of supervisors in each county with such duties as may be required by law. Miss. Code Ann. § 19-3-41 (Supp. 1987) authorizes the boards of supervisors to levy taxes necessary to meet the demands of their counties, and requires them to erect and keep in good repair "a good and convenient courthouse." Miss. Code Ann. § 19-3-43 (1987) directs the board of supervisors, when a courthouse is unfit for use, to provide and designate a suitable building in which courts may be held, to be paid for out of the county treasury.
Miss. Code Ann. § 19-25-69 (1972) gives the sheriff custodial charge of the courthouse, with the duty of keeping it clean and comfortable. If he fails to do so, the Governor has the power and duty to remove such sheriff from office. Miss. Code Ann. § 19-3-43 likewise provides that that if the board of supervisors fails to provide a suitable substitute building in which to hold court when the county courthouse is unsuitable, the sheriff may do so.
There is thus a clear statutory duty of a board of supervisors to provide adequate court facilities for each county. Encompassed therein is the duty to provide a courtroom free of noise that substantially interrupts court proceedings.[4]
It is with dismay that this Court learns that over a period of years the board of supervisors of Greene County has failed to correct a noise problem substantially interfering with all trial court proceedings. Indeed, in this case the noise was so severe and protracted that the circuit judge could have erred in not declaring a mistrial. No court is required to tolerate this degree of distraction.
The Mississippi Supreme Court, the circuit and chancery courts, and the justice courts of this State are created by our State Constitution: Art. 6, §§ 144, 152, 153, 158, 159, 171.
Our Constitution also makes the Executive, Legislative and Judicial branches of our State government separate and co-equal. Art. 1, § 1.
The same Constitutional requirement for our courts to exist obviously carries with it the duty on the part of the Legislative branch to provide sufficient funds and facilities for them to operate independently and effectively. Any holding otherwise would emasculate the constitutional mandate for three separate and co-equal branches of government by reducing courts to supplicants only of the Legislature.
Of course, courts very largely are supplicants of the Legislative branch, with that branch providing the funds and facilities for courts to operate. And, it is not what judges individually or collectively think they should receive which controls, but what the Legislature in its wisdom decides. *798 This discretionary authority of the Legislature is wide indeed, but it does not cover quite all the spectrum. If it fails to fulfill a constitutional obligation to enable the judicial branch to operate independently and effectively, then it has violated its Constitutional mandate, and the Judicial branch has the authority as well as the duty to see that courts do not atrophy. No court created by the Constitution is required to accept conditions which prevent it operating independently and effectively. Such court also has the duty under our governmental system to protect its own integrity. It likewise has the inherent authority as part of a separate and co-equal branch to make such orders to insure that independence and integrity.
No court should ever usurp the authority of the Legislature to furnish what funds and facilities it deems proper except in cases of absolute necessity. On the other hand, if the Legislative branch fails in its constitutional mandate to furnish the absolute essentials required for the operation of an independent and effective court, then no court affected thereby should fail to act. It is the absolute duty of a court in such latter circumstances to act, and act promptly. It follows, of course, that county boards of supervisors, which have imposed upon them the statutory duty of furnishing adequate courtroom facilities, are subject to appropriate court orders requiring them to do so when they adamantly fail or refuse to do so.
In this case it is the failure of the Greene County board of supervisors to correct a chronic, distracting noise problem which has substantially interfered with court proceedings for a number of years, and which neither under our Constitution nor statute any court of that county must tolerate. Nor, indeed, can it tolerate it and at the same time fulfill its judicial responsibilities.

CONCLUSION
The judiciary of this state has mercifully been spared the delicate task of preserving its own integrity while at the same time avoiding encroachment of the integrity of another branch. It has been addressed in numerous cases in other states: see: Cratsby, Inherent Powers of the Courts, The National Judicial College (1980); In re Clerk of Court's Compensation for Lyon County v. Lyon County Commissioners, 308 Minn. 172, 241 N.W.2d 781 (1976); O'Coins, Inc. v. Treasurer of County of Worcester, 362 Mass. 507, 287 N.E.2d 608 (1972); In re Juvenile Director, 87 Wash.2d 232, 552 P.2d 163 (1976). These authorities give excellent guides to any court required to follow this tortuous, distasteful, but at times absolutely necessary path. See also: Imbornone v. Early, 401 So.2d 953, 957 (La. 1981) (Dennis, J., dissenting); 59 A.L.R.3rd 569 (Supp. 1987).
The judicial branch is set apart to decide controversies in which the judges themselves are above the fray, and can sit dispassionately because they have no personal interest in the issues before them. This one fact is most responsible for the respect and confidence which people have in their judges. Conversely, the darkest cloud which can be cast upon a judge's honor is suspicion that he has a personal interest in a case. Judges are, after all, impartial and have no interest except to use their best judgment in making a decision.
In the invidious situation, however, in which a court must preserve and protect its own independence, the judge of necessity must place himself in a position of being thought a partisan. It is a situation no judge would wish upon himself.[5] Yet there is no fourth branch of government to turn to for protection. Only the judiciary can protect itself. Cautiously, yet firmly, the judge must proceed.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.

*799 APPENDIX
When the State or any party states or suggests the existence of certain damaging facts and offers no proof whatever to substantiate the allegations, a golden opportunity is afforded the opposing counsel in closing argument to appeal to the Ninth Commandment. "Thou shalt not bear false witness ..." Exodus 20:16.
In 1986 Supplement to Volume 28, Trials, Principals of Summation, under the heading "Passion," the authors first caution against artificial displays of passion. They then state:
Yet when passion is called for, passion there must be. It must be natural. It must be sincere. When justified, there is no greater force in summation than genuine indignation. "Emotional language is an acceptable weapon in closing argument."
Counsel asked your client on cross: "Did you have a bottle of gin in your car? The answer is "no." No evidence of such a bottle is ever adduced throughout the entire trial. The question is an outrage. It planted an unjustified suspicion in the minds of the jurors. The summation can fairly roar against that tactic. "They had no case. They had to slander. That question was a promise to you that they'd produce evidence of a gin bottle. They had no evidence. They have no case. They have no fairness."
28 Am.Jur.Trials 16, 27-28 (1987 Supp.).
NOTES
[1] We are not unmindful of the enactment of Miss. Code Ann. § 13-1-403, et seq. Whether these statutes constitute an invasion of this Court's rule-making power is a question yet to be addressed.
[2] The State's brief suggested that when Hosford testified on direct examination that the children loved him, this "opened the door" to the prosecutor's questions. Gill v. State, 485 So.2d 1047, 1051 (Miss. 1986); and Jefferson v. State, 386 So.2d 200, 202 (Miss. 1980), the two cases cited, fall far short of supporting the State's argument.
[3] This was also very poor trial tactics, for which an adroit defense counsel would have been grateful. See Appendix.
[4] While adequate facilities do not encompass luxurious surroundings by any means, they do at a minimum also include the following: they must enable a judge to conduct court with dignity, they must be comfortable, and as noted, quiet. There must be sanitary restrooms. No participant in court should be required to endure physical discomfort. The courtroom must be properly ventilated, properly heated in cold weather, and properly cooled in hot weather. The chairs must be of sufficient comfort so that lawyers, parties, courtroom personnel and jurors, who are required to sit for long periods, can do so without physical unease. Since court proceedings are public, there must also be sufficient space and chairs or benches provided for spectators and press.
[5] Indeed, in this case it is manifest that an experienced circuit judge has done everything he could to either avoid or postpone this predicament.