Matter of Nathalia P. (2005 NY Slip Op 50159(U))

[*1]

Matter of Nathalia P.

2005 NY Slip Op 50159(U)

Decided on January 28, 2005

Family Court, Queens County

Richardson, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 28, 2005

Family Court, Queens County
In the Matter of NATHALIA P. & ALEJANDRO R., Children Under Eighteen Years of Age Alleged to be Abused by ANATHALIA P. & JOSE R., Respondents.
NA20644-5/04

Edwina G. Richardson, J.
On November 24, 2004, the subject children, Alejandro R. (hereinafter, "Alejandro"), born March 18, 1994, and Nathalia P. (hereinafter, "Nathalia"), born June 14, 1990, were removed from their home by the Administration for Children's Services (hereinafter "ACS") following reports to the state central register of child abuse and maltreatment alleging that Nathalia was sexually abused by her stepfather, respondent herein Jose R.
On November 26, 2004, ACS filed petitions against the respondents Anathalia P. (hereinafter, "the respondent-mother"), who is the mother of both subject children herein, and Jose R. (hereinafter, "the respondent-father"), who is the father of subject child Alejandro and the step-father of subject child Nathalia. The petitions allege the following:
1. According to the subject child Nathalia, on or about June 2004, while the subject child was sitting on the couch the respondent step-father, Jose [R.], stated to the child: "you have nice legs." The respondent step-father then proceeded to rub her legs and move his hands up her body until he reached her breasts. When the respondent step-father reached her breasts he began to pull on her nipples and then rubbed her vagina. The respondent step-father then pulled open her pants and underwear and then rubbed her vagina in a circular motion. Said conduct is in violation of including but not limited to Penal Law Sections 130.52 and 130.55;
2. According to the subject child Nathalia, on or about 2002, the respondent step-father Jose [R.], entered her bedroom while the child was sitting on the bed watching television. The respondent step-father closed the door to the bedroom half way behind him. The respondent step-father then proceeded to request that Nathalia open up her legs, but when the child did not do so, the respondent step-father pushed the child back onto the bed while he took his penis out of his shorts and tried to rub it on the child's clothed vagina. The respondent stopped the incident when he heard noise coming from the kitchen where the respondent mother was located. Said conduct is in violation of including but not limited to Penal Law Sections 130.52, 130.55, 130.60; and
[*2]
3. According to the subject child Nathalia, on or about 2002, the respondent step-father Jose [R.] crossed paths as the respondent step-father was exiting the bathroom and the subject child was attempting to enter. The respondent step-father told the child Nathalia that he had something to show her and he then held out his hand with a clear yellowish substance that the child referred to as "sperm."
The petitions allege that as a result of the respondent-father's conduct Nathalia is an abused child and Alejandro is a derivatively abused child. The petitions allege that the respondent-mother knew or should have known of the alleged sexual abuse being carried on by the respondent-father and that she failed to protect both subject children from the respondent-father.
On the same day, November 26, 2004, the Court issued orders remanding both subject children to the care and custody of ACS and issued a temporary order of protection against the respondent-father requiring that he stay 500 feet away from both children. The Court permitted the respondent-mother to have agency-supervised visits with both children. The respondent-mother, through her attorney, requested a hearing pursuant to Family Court Act §1028, seeking the immediate return of the children to her care.
On December 1, 2004, the Court commenced a hearing pursuant to Family Court Act §1028. ACS called its caseworker Robyn McMillan to testify. Ms. McMillan was the only witness called that day. In addition to her testimony directly relevant to the allegations in the petition, she disclosed that Joyce DeNicholson, the ACS Child Protective Manager ("CPM") to whom this case had initially been assigned, had a private therapist/client relationship with Nathalia. That relationship existed for more than one year, possibly two years, and seems to have continued into November, 2004. The therapist/client relationship seems to have been outside the scope of Ms. DeNicholson's employment with ACS. According to Ms. McMillan's testimony, Nathalia told Ms. McMillan that she reported the fondling to Ms. DeNicholson and to her mother and that at one point she overheard her mother talking to Ms. DeNicholson, both saying that they did not believe Nathalia's accusation.
The testimony was unclear as to what action Ms. DeNicholson took, if any, after Nathalia told her about the fondling, including whether and when she reported Nathalia's statement to the state central register of child abuse and maltreatment (hereinafter, the "state central register"). The testimony also indicated that Ms. DeNicholson revealed parts of her therapy conversations with Nathalia to the respondent-mother and the respondent-father. Shortly after assigning the case to Ms. DeNicholson, ACS transferred it to another CPM because of the potential conflict of interest. The respondent-mother's attorney stated that he intended to call Ms. DeNicholson as a witness on the respondent-mother's behalf against ACS to state her belief that Nathalia was not telling the truth.
As a result of the foregoing revelations, the Court became concerned that ACS's Division of Legal Services ("DLS"), the in-house legal counsel for ACS, might be facing a conflict of interest. A proper and vigorous prosecution of the case would likely require DLS to cross examine Ms. DeNicholson and possibly attempt to discredit her testimony. CPMs are high-ranking officials of ACS with whom DLS attorneys work regularly. CPMs are typically the ultimate decision makers on behalf of ACS in a child protective matter, deciding the nature and [*3]direction of each child protective proceeding. CPMs authorize and direct the actions of the DLS attorneys in every child protective case. Because Ms. DeNicholson is a CPM, the Court saw a potential conflict in that DLS, in satisfying its duty to act in the best interest of its client, ACS, may be unwilling to discredit Ms. DeNicholson, and may, thereby, be unable to vigorously prosecute the case. It is also possible that DLS attorneys may have a personal interest in maintaining an amiable working relationship with the CPMs and, for this reason also, may be less inclined to discredit a CPM witness.
After the foregoing testimony emerged, the Court halted the proceedings and elicited all counsel's positions on the question of whether DLS should be replaced by an independent counsel to prosecute the case. The matter was adjourned to the next day, December 2, 2004.
On December 2, 2004, on the application of the respondent-mother with the concurrence of ACS and Alejandro's Law Guardian, the Court paroled Alejandro to the care and custody of the respondent-mother under ACS supervision on the condition that the respondent-father not reside in the home. The Court issued an new order of protection excluding the respondent-father from the home until further order of the Court.
Regarding the conflict of interest issue, ACS took the position that no conflict existed and therefore, DLS should not be replaced by an independent prosecutor. The Court ordered counsel to submit memoranda of law on the issues of 1) whether DLS should be relieved as the attorney in this matter because of the possible conflict of interest, 2) if DLS is relieved, should DLS be allowed to select its replacement as counsel to ACS, and 3) whether the Court should, instead, appoint an independent counsel pursuant to Family Court Act §1032(b) which states:
The following may originate a proceeding under this article:
(a) a child protective agency, or
(b) a person on the court's direction.
To enable the Court to properly address this issue, it ordered ACS to produce to the Court a copy of the discovery materials that had been produced to all counsel in the case prior to the commencement of the §1028 hearing. The matter was adjourned to December 15, 2004.
On December 15, 2004, the §1028 hearing concluded. The Court found that the child Nathalia would not be at imminent risk of harm if permitted to reside with the respondent-mother with ACS supervision. The Court continued the temporary order of protection excluding the respondent-father from the home.
Memoranda of law have been submitted to the Court and the Court has been provided with the discovery materials.
The discovery materials include what appear to be either notes of Ms. DeNicholson's therapy sessions with Nathalia or a summary thereof. These notes record highly personal information that is most likely confidential and protected by privilege. Some of this information is completely irrelevant to this case. These notes appear to have been released to ACS without Nathalia's consent. Any release of protected information without Nathalia's consent would be improper. Also, if Ms. DeNicholson did not make a report to the state central register in August 2004, her failure to do so may have been a violation of Social Services Law §413 which requires mental health professionals and social services workers to make a report whenever they have reasonable cause to suspect that a child is abused or maltreated. If improprieties or violations of [*4]law occurred in Ms. DeNicholson's handling of confidential information and reporting, it would leave Ms. DeNicholson particularly vulnerable to attack upon cross examination and this makes it more likely that DLS, because of the potential personal interest involved, would be unable to properly probe these matters against their own CPM. The Court is concerned that in this case, DLS's duty to act in the best interest of its client may be in conflict with DLS's potential personal interest in maintaining an amiable working relationship with the CPMs and that conflict may prevent DLS from vigorously prosecuting the case and obtaining a result in the best interest of the subject children.
Discussion
Before turning to the foregoing considerations, the Court notes its concerns about the manner in which this child protective matter was handled before the petition was filed. The unusual sequence of events in this case raises the same question about whether ACS or DLS, or both, handled this case in a less diligent manner than they would normally have handled it. If it was handled less diligently than normal and the reason was Ms. DeNicholson's uncommon relationship to the case, this would increase the Court's concern about the depth and extent of DLS's potential conflict.
First, Ms. DeNicholson stated in her notes that she attempted on August 2, 2004 to call in a report to the state central register but the report was "not accepted." It strikes the Court as odd that Ms. DeNicholson, a high-ranking ACS official, presumably well-experienced in submitting such reports, was unable to submit a report to the state central register when she attempted to do so.
Second, the record indicates that the first report received in this case by the state central register was called in on November 1, 2004 by Nathalia's teacher. On November 3, 2004, Ms. DeNicholson was relieved of her duties as CPM on the case because of her potential conflict of interest as Nathalia's therapist. At about this time, Nathalia was referred to Bellevue Hospital Center's Francis L. Loeb Child Protection and Development Center for a full assessment. A Bellevue Hospital social worker called in another report to the state central register on November 24, 2004. It was not until November 26, 2004, after the second report was received by the state central register, that ACS filed the instant petitions. This leaves the Court wondering why ACS took no legal action for 25 days following the November 1, 2004 report by Nathalia's teacher.
Third, according to the testimony received, the respondent-mother did not believe that the respondent-father had abused Nathalia. Knowing that the respondent-mother did not perceive a danger to Nathalia, ACS permitted Nathalia to reside with her mother from November 1, 2004 to November 26, 2004 despite the fact that the respondent-mother would be less likely to protect Nathalia from the respondent-father and the significant risk that if the allegations were true, further harm might be done.
Potential Conflict of Interest
DLS, in the memorandum it submitted to the Court, argues that there is no conflict of interest. It argues that under the Code of Professional Responsibility, Disciplinary Rule 5-101, a conflict of interest exists where an attorney possesses personal, business or financial interests at odds with that of his client. Disciplinary Rule 5-101A states:
[*5]
A lawyer shall not accept or continue employment if the exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests, unless a disinterested lawyer would believe that the representation of the client will not be adversely affected thereby and the client consents to the representation after full disclosure of the implications of the lawyer's interest.
DLS argues that in this case, no such financial, business, property or personal interest exists. The Court disagrees. CPMs are highly influential, upper-level ACS management officials. They closely control and direct the work of the DLS attorneys. It is conceivable that a CPM has influence over a DLS attorney's working conditions and future advancement at ACS. The Court believes that a DLS attorney's interest in preserving an amiable working relationship with the CPMs constitutes a potentially significant personal interest and possibly a financial interest of the DLS attorney. Even if a particular CPM does not have the above-described influence over a particular DLS attorney's work environment or advancement, that CPM is still a high-ranking employee of the attorney's client and a person from whom the attorney normally takes orders directing the prosecution of a child protective case. Among other controls a CPM has over DLS attorneys, a DLS attorney is not permitted to consent to a negotiated settlement of a case without the approval of a CPM. At the very least, a CPM is a person with whom DLS attorneys must work day-to-day. Having such a relationship with the CPMs, DLS attorneys are likely to have a personal interest in maintaining an amiable working relationship with the CPMs and the Court finds that the exercise of the DLS attorney's professional judgment on behalf of the client reasonably may be affected by that interest.
Because ACS investigated the allegations, made the decision to prosecute this case, and caused petitions to be filed, it must be assumed that ACS believes that the allegations are true and has instructed its attorney to fully and vigorously prosecute the case. However, it now appears likely that the proper prosecution of this case will require a DLS attorney to discredit a CPM witness. The Court believes that any DLS attorney, when faced with the need to discredit a CPM on cross examination, is likely to be influenced by a potential personal or financial interest in protecting his or her relationship with the CPM and that that interest, in this case, may be at odds with the interest of ACS in fully prosecuting the case. The Court believes that the DLS attorney's potential personal or financial interest would be likely to influence how vigorously the DLS attorney pursues the cross examination. Certainly there is the appearance of a conflict.
The Appellate Division, Second Department ruled in People v. John Gallagher and Albert Sinram,143 AD2d 929, 533 NYS2d 554 (2nd Dept., 1988) that where members of the district attorney's office were material witnesses in a case and possibly targets of an investigation because of their involvement with that case, it was necessary to disqualify the district attorney and permit the appointment of a special district attorney pursuant to County Law §701 in order to protect the public interest from "actual prejudice arising from a demonstrated conflict of interest or a substantial risk of an abuse of confidence." Gallagher, at 932 quoting Schumer v. Holtzman, 60 NY2d 46, 454 NE2d 522, 467 NYS2d 182 (1983). A similar prejudice is created here by the same type of conflict of interest or substantial risk of abuse of confidence described in Gallagher. The appointment of someone other than DLS to prosecute this case would eliminate the prejudice created by these circumstances.
[*6]
Dealing with the issue of a District Attorney's possible conflict of interest, the Court of Appeals in People v. Graeme Zimmer, 51 NY2d 390, 414 NE2d 705, 434 NYS2d 206 (1980) held that:
prejudice can at least as easily flow from an act of omission as from one of commission, from discretion withheld as from discretion exercised. In this context, whether abuse is express or implied may be difficult to determine. Suffice it to say that any presumption of impartiality tends to be undermined when there is a clear conflict of interest. Indeed, the judgmental nature of much of a District Attorney's conduct will put it beyond effective appellate review. And, no matter how firmly and conscientiously a District Attorney may steel himself against the intrusion of a competing and disqualifying interest, he can never be certain that he has succeeded in isolating himself from the inroads on his subconscious.
Thus, the practical impossibility of establishing that the conflict has worked to defendant's disadvantage dictates the adoption of standards under which a reasonable potential for prejudice will suffice.... Nor is the gravity of that potential lessened because it may cut either or both of two ways, against a defendant or against the People, toward each of whom the discharge of the District Attorney's duties of course should be uninhibited by subjective influences.
People v. Zimmer, at 394
The same concerns apply here. In fact, because a DLS attorney's function in a child protective case is similar to that of a district attorney prosecuting a criminal case, the Zimmer court's insights are particularly apt. The Zimmer court's standard of "a reasonable potential for prejudice" is clearly met in the instant case. There is a reasonable potential for prejudice against ACS and against the interest of the subject children due to the DLS attorney's potential personal or financial interest in maintaining a good relationship with a CPM and arising from DLS's duty to act in the best interest of its client.
In People v. Rocci, 184 Misc2d 670 (City Court of Utica, 2000), the defendant got into an argument with the complainant and punched the complainant in the face. An Assistant District Attorney was a witness to the incident. The Assistant District Attorney later signed a supporting deposition attached to the complaint that supported the position of the defendant. The court disqualified the District Attorney's office from prosecuting the case and made a request to the County Court for the appointment of a special district attorney. Citing Schumer v. Holtzman and People v. Gallagher, the court reasoned that allowing the District Attorney to prosecute the case "would give at the very least an appearance of impropriety which cannot be disregarded." People v. Rocci, at 672. The Court held that "[h]ere, where one of the eye witnesses to the incident was an assistant district attorney who was assigned to Utica City Court, and where that person's testimony seems to be more favorable to the defendant, it appears that it would be difficult for other members of his office to vigorously cross examine that witness to properly prosecute this case." Id. At 673.
In its memorandum to the Court in support of the replacement of DLS, the Law Guardian cites Ethical Consideration 5-18 of the Code of Professional Responsibility, which states:
Occasionally, the lawyer [employed or retained by a corporation or similar entity] may learn that [*7]an officer, employee or other person associated with the entity is engaged in action, refuses to act, or intends to act or refrain from acting in a matter related to the representation that is a violation of the legal obligation to the entity, or a violation of law which reasonable might be imputed to the entity, and is likely to result in substantial injury to the entity. In such event, the lawyer must proceed as is reasonably necessary in the best interest of the entity. In determining how to proceed, the lawyer should give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the responsibility in the entity and the apparent motivation of the person involved, the policies of the entity concerning such matters and any other relevant considerations. Any measures taken should be designed to minimize disruption of the entity and the risk of revealing confidences and secrets of the entity.
The Law Guardian argues persuasively that because Ms. DeNicholson may have acted improperly or illegally in her handling of confidential information or in reporting the matter to the state central register and thereby cause embarrassment or liability to ACS, this ethical consideration provides an incentive to DLS to limit the vigorousness of its cross-examination of Ms. DeNicholson if doing so would be in the best interest of ACS.
For the aforementioned reasons, the Court finds that no DLS attorney would be able, in these circumstances, to continue to represent ACS as petitioner in these proceedings without a conflict of interest and that substitute counsel must be appointed to continue the prosecution of this case.
The Corporation Counsel's Right to be a Party
The Corporation Counsel is a necessary party in all abuse cases, pursuant to Family Court Act §254(b). In the typical abuse case, the Corporation Counsel prosecutes the case by designating DLS attorneys as special assistant corporation counsels. Because the Corporation Counsel is a necessary party, DLS will be permitted to continue on behalf of the Corporation Counsel to represent ACS in all respects in this matter other than prosecution. In this way, DLS is freed from the conflict that is likely to cause prejudice. Let it be clear that in replacing DLS, this Court in no way intends to interfere with ACS's choice of representation any further than is necessary to eliminate prejudice.
Authority to replace DLS
The Court finds no authority for the proposition that the counsel for the originator of a child protective proceeding may not be changed in the interest of justice where retention of the counsel for originator would very likely introduce prejudice into the proceeding. It would be absurd if this were not so.
Family Court Act §1032(b) permits the Court to direct a person to originate a proceeding under article 10 of the Family Court Act. ACS argues that the language of Family Court Act §1032(b) prohibits the Court from replacing ACS as prosecutor of the case because the case has already been "originated" and unless the existing case is dismissed, an identical proceeding may not be originated. There are no grounds for dismissal of the existing case.
Although the Court does not rely solely on Family Court Act §1032(b) for the authority to [*8]substitute counsel, the Court will address ACS's argument. The Court believes that the intent of Family Court Act §1032(b) is to articulate the legislature's concern that where a child protective agency does not prosecute a child protective proceeding, someone properly qualified and appropriate in the judgment of the court shall prosecute it. As ACS states in its memorandum to the Court, prior to a 1973 amendment to Family Court Act §1032, anyone could initiate a child protective proceeding. The purpose of the1973 amendment was, according to McKinney's practice commentaries, "to erect a barrier against the indiscriminate initiation of child protective proceedings." The intent of the legislature in requiring that the origination of a proceeding by someone other than a child protective agency be directed by the court is outlined by the Court of Appeals in Matter of William E. Weber v. Stony Brook Hospital, 60 NY2d 208, 456 NE2d 1186. In Weber, the Court of Appeals held that the legislature's intent was that "judicial proceedings touching the family relationship should not be casually initiated" and the requirement that the court direct the origination of a proceeding by someone other than a child protective agency "imposes upon the courts the obligation to exercise sound discretion before permitting such petitions to be filed." Weber, at 212. This Court believes it is acting in full and conscientious compliance with that intent. It is the opinion of this Court that the issue of disqualification of the originator was not contemplated by Family Court Act §1032(b) and that the authority for disqualification of an attorney for conflict of interest, or the appearance thereof, arises from decisional precedent with the guidance of the Code of Professional Responsibility.
Choice of Replacement for DLS
DLS argues that if DLS is relieved of its duty to prosecute in this case, it must be permitted to choose its replacement. In support of its argument, DLS quotes McKinney's Practice Commentary for Family Court Act §254(b), written by Douglas Besharov which states that the Corporation Counsel is required to be a party "to insure the fullest possible development of facts and law so that the children's safety and well-being are best protected." As stated previously, it is questionable whether the fullest possible development of facts and law is achievable with DLS as prosecutor in light of DLS's conflicting interests here. In this case, the McKinney's Practice Commentary would argue in favor of replacing DLS with a disinterested attorney who would be free to pursue the fullest possible development of facts and law. It does not follow in these circumstances that the replacement counsel must be of ACS's choice. In Greene v. Greene, 47 NY2d 447, 391 NE2d 1355, 418 NYS2d 379 (1979), the Court of Appeals held that "[a]lthough it is usually recognized that a party to litigation may select an attorney of his or her choosing, this general right is not limitless. The attorney...may not allow his own interests to conflict with those of his client. To hold otherwise would be to ignore the overriding public interest in the integrity of our adversary system." Greene, at 453.
Furthermore, permitting ACS to choose its replacement would not necessarily provide the needed protection of the children's interests because ACS's chosen replacement may well be someone with similarly conflicting interests. DLS stated that it would not oppose the transfer of the case to another borough of the City of New York to be prosecuted by a different DLS staff. Although the DLS attorneys in another borough do not work as closely with Ms. DeNicholson as the Queens County DLS attorneys, it is quite possible that the DLS attorneys in another borough may feel that their full and proper cross examination of any CPM would put them at risk of [*9]alienating their own borough's CPMs who would see the DLS attorney as being willing to take sides against them. Therefore, transferring the case to another borough would not solve the problem.
Conclusion
The Court finds that replacing DLS would eliminate potential prejudice and avoid any appearance of impropriety arising from potential personal or financial interests of DLS that, because of the particular circumstances of this case, would be in conflict with DLS's duty to its client and its duty to seek a just result in the best interest of the subject children. The Court finds that an independent counsel who is familiar with child protective proceedings should continue the prosecution of this case.
ORDERED: that DLS is relieved of its duty to prosecute this case and that Assigned Counsel Panel attorney Daniel Moskowitz is appointed as independent counsel to prosecute this case, effective immediately. Mr. Moskowitz shall be provided with social work and investigative staff paid by the Law Guardian Program of the Appellate Division, Second Department, pursuant to §722c of the County Law. DLS is permitted to continue to appear and represent the interests of ACS and the Corporation Counsel in all respects other than the prosecution of the case.
This constitutes the decision and order of the Court.
ENTER:
____________________________________
EDWINA G. RICHARDSON
Judge of the Family Court
Dated:Jamaica, New York
January 28, 2005