*998 OPINION OF THE COURT
Alan D. Scheinkman, J.
Defendant Patrick Castaldo moves, pursuant to County Law § 701, for the removal of the Putnam County District Attorney and for the appointment of a special district attorney to conduct the prosecution of this criminal action. The application is opposed by the Putnam County District Attorney.
Defendant stands charged, by indictment No. 1/2015 dated February 6, 2015, with one count of offering a false instrument for filing in the first degree in violation of Penal Law § 175.35 (a class E felony); one count of attempted assault in the third degree in violation of Penal Law §§ 110.00, 120.00 (1) (a class B misdemeanor); and one count of official misconduct in violation of Penal Law § 195.00 (2) (a class A misdemeanor). These charges arise from an incident on July 3, 2014. The gist of the matter is that defendant, then a Senior Investigator employed by the Putnam County Sheriff, is accused of attempting to assault a prisoner, neglecting official duties, and falsifying paperwork regarding the incident.
The Authority to Determine the Application
The District Attorney contends that this application should be assigned to “the acting County Court Judge presiding over this matter” (People’s mem of law at 10), referring to Hon. Robert Neary, who has been assigned to preside over this case. For the reasons which follow, such a reference is not legally permissible.
Section 701 (1) of the County Law provides that, when the district attorney of a county is disqualified from acting, a superior criminal court in the county wherein the action is triable may order the appointment of a special district attorney. Hon. Robert Neary, a Judge of the Court of Claims assigned as an Acting Supreme Court Justice, presides in a superior criminal court in Putnam County. However, Uniform Rules for Trial Courts (22 NYCRR) § 200.15 provides further regulation:
“Any party filing with a superior court an application for appointment of a special district attorney, pursuant to section 701 of the County Law, shall make the application to the Chief Administrator of the Courts or to an appropriate Deputy Chief Administrative Judge. The Chief Administrator, Deputy Chief Administrative Judge, or appropriate Administrative Judge shall assign a superior court *999 judge to consider the application as provided by law, selected from a list of judges established for that purpose that has been approved by the Chief Administrator and the Presiding Justice of the appropriate Appellate Division.”
The Annual Order for the Ninth Judicial District, promulgated by the Chief Administrative Judge and the Presiding Justice of the Second Judicial Department, specifies the jurists who may hear applications pursuant to County Law § 701. The undersigned is one of the jurists so listed; Judge Neary is not.
Upon submission of this application, the motion papers were referred to Hon. Michael V. Coccoma, Deputy Chief Administrative Judge for Courts Outside New York City, so that the application would be treated as having been filed with him in accordance with the provisions of section 200.15. Judge Coccoma thereafter, by order, assigned the undersigned to determine the application. The undersigned, as an elected Supreme Court Justice in the Ninth Judicial District, presides over matters in all counties in this District, including Putnam County, and was selected by Judge Coccoma from the list of judges authorized to hear these applications by the Chief Administrative Judge and the Presiding Justice.*
Accordingly, the application has been properly assigned to the undersigned and will be decided by the undersigned.
The Contentions of the Parties
Defendant seeks the disqualification of the Putnam County District Attorney on the basis of the allegations and counter-allegations that have been exchanged between the District Attorney and the Putnam County Sheriff during and in the aftermath of People v Hossu, a rape prosecution in which the defendant was acquitted. The acquittal came on April 3, 2014. The Hossu case spawned two civil lawsuits, one by District Attorney Adam B. Levy against Sheriff Donald B. Smith and one by Smith against Levy. Hossu was a close personal friend of Levy. Defendant Castaldo was, at the time, a senior member of the Sheriffs Office.
*1000 1. The Levy Lawsuit
On August 14, 2013, while the Hossu case was still pending, Levy filed a civil action against Smith, individually, as well as against seven “John Doe” potential unidentified defendants, in Supreme Court, Putnam County (Levy v Smith, Lubell, J., index No. 2019/13) (the Levy lawsuit). The “John Doe” defendants are stated in the complaint as being individuals, whose identity is not known with certainty by Levy but who “represent individuals who participated in the publication and dissemination of the below-referenced defamatory statements with defendant Smith.” The complaint was verified by Levy and was interposed on his behalf by Michael H. Sussman, Esq., of Suss-man & Watkins.
In the complaint, Levy alleges that Smith and his senior investigators were initially resistant to suggestions that Levy made when he first became District Attorney but after a few months they became more receptive, only to have hostility reemerge in late 2010 and increase into 2011 and 2012. According to the complaint, Levy decided that many of Smith’s decisions were politically motivated, devoid of legitimate law enforcement purposes and potentially harmful to crime victims, police officers and taxpayers. Levy alleges that Smith refused to address the failure of the Sheriffs Office to follow the operating procedures of the Child Advocacy Center.
Levy makes detailed allegations as to how the criminal proceedings against Hossu arose, his recusal, his decision to recuse, and his directions to his staff to request that the undersigned appoint the Westchester County District Attorney’s Office to handle the investigation. Levy asserts that Sheriffs Investigator Steven Tricinelli conducted interviews without first speaking with an Assistant District Attorney from Westchester. Levy alleges that he was concerned that Smith would politicize the case and would arrest Hossu without first conducting a proper investigation. He attributes this to Smith preparing, in March 2013, to seek reelection during the year, with two potential challengers for the Republican nomination, one of whom was a senior official with the Putnam County District Attorney’s Office. Levy details that Tricinelli filed a felony complaint against Hossu charging him with forcible rape on October 24, 2010 and that, after an arrest warrant was issued on March 20, 2013, Smith and his senior staff went to Hossu’s home at 221 Clock Tower Commons, at approximately 10:20 p.m., and arrested him. Levy charges that in the week *1001 leading up to the arrest, Smith and his senior staff focused their time, energy and resources attempting to connect Levy to Hossu, as opposed to thoroughly investigating the charges. Levy alleges that Smith and his senior staff effectuated Hossu’s arrest without having used any case enhancement procedures, without obtaining records, and without interviewing witnesses.
Levy asserts that on March 21, 2013, following Hossu’s arrest, Levy was contacted by a reporter from the Journal News who told Levy that an anonymous source from the Sheriffs Office leaked a story about Hossu’s arrest and that Hossu was Levy’s “live-in” personal trainer. Levy alleges that, several hours later, Smith issued an official press release which reported Hossu’s arrest for forcible rape and gave an address for Hossu that was Levy’s address. This, according to Levy, led to media inquiries and media attention that frightened his wife and his young children. After Levy issued his own press release stating that Smith’s use of Levy’s address as Hossu’s was erroneous and that Levy had recused himself from Hossu’s case, Smith allegedly issued a second press release and that, as result thereof, Smith was reported as asserting that: Levy had used his office to influence a child rape case involving a suspect well known to him; Levy had tried to undermine the rape investigation; Levy had committed ethical violations; Levy had tried to distract the public from the nature of the case; and Levy had used his office to mislead the public and influence the rape investigation. Levy alleges that Smith accused Levy of harboring, shielding, aiding and abetting Hossu. Levy claims that Smith did these things because Smith viewed Levy as a political enemy and as an obstacle to Smith’s securing his party’s nomination for reelection. Levy seeks $3 million in compensatory damages and $2 million in punitive damages.
On this motion, Castaldo, by his attorney, Andrew Quinn, Esq., asserts that, since the inception of discovery in the Levy lawsuit, Levy has identified Castaldo (along with others in the Putnam County Sheriffs Department) as a witness to be deposed and questioned. Levy secured from Justice Lewis J. Lubell, the Justice assigned to the Levy lawsuit, an order permitting Levy to personally question nonparty employees of the Putnam County Sheriffs Department, such as Castaldo. And there is no dispute over the fact that Levy has sought to obtain Castaldo’s testimony in the civil suit and that Castaldo has resisted testifying.
*1002 On February 12, 2015, shortly after the date of the instant indictment, Mr. Sussman wrote to Justice Lubell seeking judicial assistance in obtaining Castaldo’s testimony. In particular, Mr. Sussman described Castaldo, and Gerald Schramek, as being “two senior members of the Sheriffs Department.” Mr. Sussman explained that Levy “needs these depositions because both men were in the chain of command and were communicating with the Sheriff about the Hossu investigation between March 12-March 23, 2015.” Mr. Sussman asserted further that the lead investigator had not identified any interference by Levy and that this investigator had briefed both Castaldo and Schramek.
Mr. Sussman added:
“I have re-assured Mr. Silverman [Castaldo’s civil counsel] that the depositions of Castaldo and Schramek will focus narrowly on relevant issues, that I do not expect to question either man about the current Grand Jury which is investigating an allegation of criminal conduct by Castaldo entirely unrelated to the instant litigation.”
Annexed to Mr. Sussman’s letter were two exhibits. While the above-referenced quotation cites to exhibit 2, which consists of emails between counsel concerning deposition dates and is not particularly enlightening, exhibit 1 includes an email from Mr. Lewis Silverman to Mr. Sussman, in which Mr. Silverman states that “[biased on the pending Grand Jury investigation, Gerald Schramek and Patrick Castaldo have advised that they will not appear for their depositions in this case at this time.”
Castaldo argues that the Levy lawsuit puts Levy in a conflict of interest. Castaldo contends that Levy had him indicted in order to gain leverage in the civil litigation and to punish Castaldo for his participation in the Hossu investigation. Castaldo claims that he could not take advantage of his opportunity to testify before the grand jury because he was concerned that Levy would engage in prosecutorial misconduct via procuring inadmissible evidence before the grand jury. Castaldo argues that, if this case goes to trial, Levy will retaliate against him by naming him as a defendant in the civil case, Levy will use his authority in the criminal case to collect evidence beneficial to Levy’s civil case, and Levy’s professional judgment will be clouded by his personal pecuniary interest.
Castaldo argues further that Levy is in a position to obtain Castaldo’s civil deposition for the purpose of gathering evi *1003 dence in the criminal case and to gain leverage or to attempt to get Castaldo to incriminate himself. Castaldo claims that Levy might offer him a favorable outcome in the criminal case in exchange for favorable testimony in the civil case or, even if Levy does not explicitly offer such a bargain, Castaldo may feel that if he testifies favorably towards Levy’s civil case, it may “ameliorate” Levy and spare Castaldo the criminal prosecution.
Castaldo also points to Mr. Sussman’s assertion in his February 12 letter to Justice Lubell — that he would avoid questioning Castaldo about the grand jury investigation — as necessarily indicating that Levy made Mr. Sussman aware of the grand jury investigation and its scope.
In opposition, Chana Krauss, Chief Assistant District Attorney, asserts, based on her conversations with Levy, that Castaldo is not a named litigant in the Levy lawsuit, is not a “John Doe” defendant and that any claim or insinuation to the contrary is “at best, speculative.” As such, she argues, Castaldo’s argument relies entirely upon speculation and is predicated upon the “meaningless conclusion that he is a ‘potential’ defendant in the Levy v Smith matter.” Ms. Krauss asserts that the events which form the basis for the present indictment are unrelated to the civil case. Insofar as the accusation that Mr. Sussman was made privy to grand jury information is concerned, she points out, accurately, that the disclosure that there was a grand jury investigation was made in Mr. Silverman’s email to Mr. Sussman. But, the court notes, that email did not mention the matters being investigated.
In reply, Castaldo’s counsel points out that Levy has continued “relentlessly” to depose Castaldo in the civil case. On March 19, 2015, Mr. Sussman, on Levy’s behalf, moved to compel Castaldo to testify at a deposition and also moved for $2,500 in sanctions against Andrew Quinn, Esq., Castaldo’s attorney in this criminal case. In support of the motion, Mr. Suss-man asserted that Castaldo had participated in both press releases issued by Smith concerning the arrest of Hossu. Mr. Sussman stated that the lead investigator testified that Levy did not interfere in the Hossu investigation and never claimed to Castaldo or any other superior that Levy had interfered. Hence, Mr. Sussman stated, since Smith accused Levy of interfering in the Hossu investigation,
“it is critical for [Levy] to depose those who routinely, regularly and directly briefed Smith concerning this matter to ascertain whether any of these *1004 persons advanced this claim or suggestion to him and, if so, the grounds for the claim. It is for this rather simple reason that [he has] been seeking to take Castaldo’s deposition since April 2014.”
Mr. Sussman makes it clear that Castaldo is an “important witness” in the Levy lawsuit. Nevertheless, Mr. Sussman asserts that Castaldo is not a “John Doe” in the Levy lawsuit and “will not be individually substituted for one of the ‘John Does’ in this matter.”
While Levy had obtained a court order allowing him to personally depose Castaldo, Mr. Sussman averred, in his motion, that he, Mr. Sussman, would take the deposition that would focus on matters pertinent to the Levy defamation case. Mr. Sussman disclaimed having been given any grand jury information and pledged to play no role in Castaldo’s prosecution.
The claim for sanctions against Mr. Quinn comes from Mr. Sussman’s assertion that Mr. Quinn had “burdened” Justice Lubell with a letter accusing Levy of sharing secret proceedings with Mr. Sussman. This, says Mr. Sussman, was a false accusation against Levy which also “besmirched” Mr. Sussman. He claims that, because he had to spend six hours at court conferences to discuss the false allegation, Mr. Quinn should be sanctioned.
In response to Ms. Krauss’ argument that the Levy lawsuit is not related to this prosecution, Mr. Quinn rejoins that this ignores that Levy has an actual ongoing financial interest in the Levy lawsuit and in Castaldo’s testimony therein.
2, The Smith Lawsuit
Another basis for disqualification, according to Castaldo, is the lawsuit that Smith brought against Levy on April 18, 2014 (Smith v Levy, Sup Ct, Putnam County, Lubell, J., index No. 782/14) (the Smith lawsuit). In the complaint, Smith alleges that Levy made knowingly false statements in order to disparage Smith. By way of prelude to the claimed defamatory statements by Levy against Smith, Smith launches a number of broadsides against Levy, including allegations that Levy has “skeletons” in his closet, that Levy’s benefactor was former Senator and federal felon Vincent Leibell, that Leibell effectively made Levy District Attorney and Levy made large contributions to Leibell’s campaigns, that Levy shared confidential information with Hossu’s defense team, and that Levy’s conduct is being investigated by certain agencies and has been criticized by an ethics professor.
*1005 More to the point, Smith alleges that Levy has wrongly stated that Smith has had declining mental health for five years, is “clearly delusional” and “absolutely paranoid,” uses intimidation tactics and is a “bold-faced liar.” Smith claims $5 million in damages.
In support of disqualification, Castaldo argues he is a critical witness in the Smith lawsuit whose testimony could make the difference as to whether Levy has to pay millions of dollars to Smith. In opposition, Ms. Krauss asserts that the Smith lawsuit is unrelated to the present prosecution and that it is merely “guesswork” and “pure speculation” as to whether Castaldo is anything more than a “theoretical” witness.
3. The Michelle Carter “Leak”
Mr. Quinn asserts that, on February 24, 2015, Captain William McNamara of the Putnam County Sheriffs Office received a telephone inquiry from a local television reporter who related that the reporter had been told by Michelle Carter, a media consultant privately paid and retained by Levy, that Castaldo was being indicted by a grand jury and that Schramek had testified before the grand jury against Castaldo. It is asserted that this is an instance of improper disclosure of grand jury information, showing the substantial risk of abuse of confidences in the Putnam County District Attorney’s Office.
Ms. Krauss rejoins that defendant has not submitted any “proof substantiating these hearsay and double hearsay claims, such as an affidavit from Captain McNamara.” In reply, defendant submits an affidavit from Captain McNamara who asserts that on February 11, 2015, at approximately 1:43 p.m., he was called by Ty Milburn, a reporter for News 12 Westchester. According to McNamara, Milburn stated that Michelle Carter told him “off the record” that Castaldo would be indicted and that Schramek apparently testified against Castaldo before the grand jury.
Without prior authorization from this court, Ms. Krauss submits a surreply in which she complains that she needs to submit a surreply to “protect the integrity of this proceeding” by “correcting the record.” Though the unauthorized submission of a surreply is improper, the court has nevertheless considered it given the unusual nature and importance of this application.
Despite her earlier affirmed suggestion that an affidavit from Captain McNamara might be in order and the failure to provide *1006 one was significant, Ms. Krauss now asserts in her surreply that McNamara’s affidavit “does not tend to prove any material fact” and is comprised of hearsay. She also offers a statement from Michelle Carter (taken by District Attorney Investigator Henry Lopez under penalty of perjury) that, while she did speak to Milburn on February 11, 2015, he was following up on an article on Schramek’s resignation and she only told him that the District Attorney’s Office could not comment. She states that she referred Milburn to the Sheriffs Department and County Department of Personnel as additional potential sources of information. She denies having an “off the record” conversation with Milburn in which she told him that Castaldo was being indicted by the grand jury.
4.The Moten Matter
On the night of March 20, 2013, while members of the Putnam County Sheriffs Department were at the Clock Tower Commons for the purpose of executing the Hossu warrant, they encountered Shalter Moten and arrested him for alleged offenses unrelated to the Hossu matter — reckless driving and speeding. Deputy Daniel Hunsberger was the arresting officer on these charges. However, it appears that there was a heated interaction between Moten and the Sheriffs deputies, including Castaldo, and Moten was arrested for disorderly conduct, with Castaldo being the arresting officer, and Moten was held overnight. All of the charges against Moten were eventually dismissed.
On September 24, 2014, a Dunaway /Huntley hearing was held before Hon. Gregory Folchetti in the Moten case in the Justice Court for the Town of Southeast. By that time, the disorderly conduct charge had already been dismissed.
Prior to the hearing day, Levy and his assistants sought to interview a number of deputies to prepare for the hearing. According to Castaldo’s counsel, and not refuted by Ms. Krauss, the deputies perceived that the questioning related mostly to Smith, Castaldo and the Hossu case. As a consequence, the Sheriffs Department ceased sending its deputies to Levy’s office for “prep” sessions on Moten unless accompanied by senior personnel and/or union representation.
The transcript of the September 24, 2014 hearing reflects that the prosecution was handled by Levy personally, accompanied by an assistant district attorney. Moten was represented by two attorneys from the Putnam County Legal Aid Society and the Quinn Law Firm, which represents Castaldo *1007 herein, appeared at the hearing on behalf of the Putnam County Sheriffs Department.
Castaldo’s counsel now argues that Levy used the Moten hearing to discredit members of the Sheriffs Department for purposes of Levy’s own civil suit against Sheriff Smith. Ms. Krauss counters by arguing that a prosecutor has the ethical obligation not to maintain improperly supported charges and, therefore, the prosecution cannot be faulted for trying to present to the court a fair and candid explanation of what occurred with respect to Moten’s arrest and detention.
A review of the transcript of the hearing reflects that Levy did show considerable interest in matters outside the four corners of the incident involving Moten. However, no objection was interposed to the scope of Levy’s examination of the witnesses by anyone. While it is perhaps understandable that Mo-ten’s counsel did not wish to limit the scope of the questioning — since much of it was obviously designed to be helpful to their client — no objection was attempted by counsel for the witnesses, whose appearance was officially recognized on the transcript. Levy himself, at the outset of the hearing, stated that he planned to call an unusually large number of witnesses because of the “unique circumstances surrounding this case,” which included his inability to speak to certain witnesses in advance of the hearing.
Of some interest, the transcript includes that Castaldo appeared at the court for the hearing, pursuant to a subpoena, but left prior to the commencement of the hearing, claiming that he had a family emergency. Levy identified Castaldo as the “crux” of the People’s case, notwithstanding that the charge for which Castaldo was the arresting officer had been dismissed and that Hunsberger, who was present and did testify, was the arresting officer on the remaining charges. Whatever the bona fides of Castaldo’s reasons for leaving, no issue was made of it. Levy did not ask for an adjournment or a continuance for the purpose of securing Castaldo’s testimony; the record does not reflect that Levy sought to hold Castaldo in contempt or otherwise sought to compel his testimony.
It is fair to say that, during the Moten hearing, Levy raised questions regarding whether the Sheriffs deputies acted appropriately while at the Clock Tower Commons and, in particular, as to their conduct with respect to Moten. However, there is nothing on the face of the transcript that indicates that Levy was endeavoring to use the Moten hearing to achieve any col *1008 lateral objective. Rather, it appears that Levy had concerns regarding the actions taken on that occasion. Moreover, his adoption of a critical approach to the prosecution of Moten was within his broad discretion.
The Relevant Legal Standard
A district attorney is a constitutional officer chosen by the voters of the county who has the duty and the responsibility to conduct all prosecutions for crimes and offenses cognizable by the courts of the county. The district attorney’s broad statutory authority to prosecute all crimes and offenses within the jurisdiction is generally not delegable (Matter of Soares v Herrick, 20 NY3d 139, 144 [2012]). While County Law § 701 (1) allows a court to appoint a special district attorney where the elected district attorney is disqualified from acting, this statute is narrow and its purpose is to fill emergency gaps in an elected prosecutorial official’s responsibility (People v Leahy, 72 NY2d 510, 513 [1988]). A court may displace a duly elected official only in exceptional circumstances and the court’s authority should not be expansively interpreted (id. at 513-514).
As a general rule, courts should remove a public prosecutor from a particular case only to protect a defendant from actual prejudice arising from a demonstrated conflict of interest or a substantial risk of an abuse of confidence (Matter of Schumer v Holtzman, 60 NY2d 46, 55 [1983]). This restrictive standard recognizes that the district attorney is a constitutional officer chosen by the electorate and who may be displaced only under narrow circumstances (id.).
Under the conflict of interest standard, more than an appearance of impropriety is required; actual prejudice must be shown or, at least, so substantial a risk of actual prejudice that it cannot be ignored. Thus, a prior attorney-client relationship between a defendant and a prosecutor is insufficient to warrant disqualification of the prosecutor in the absence of actual prejudice (People v English, 215 AD2d 774 [2d Dept 1995], affd 88 NY2d 30 [1996] [defendant’s former attorney was hired by District Attorney’s office but was placed in a bureau other than the bureau handling the case and did not speak with the prosecutor assigned to the case]; People v Giroux, 122 AD3d 1063 [3d Dept 2014] [that District Attorney had represented defendant in prior, unrelated criminal and domestic relations matters, standing alone, did not require disqualification]). Similarly, that the alleged victim or the defendant may be re *1009 lated to an assistant prosecutor not involved in the matter is not sufficient to warrant disqualification of the entire office, in the absence of actual prejudice (see People v Johnson, 20 AD3d 808 [3d Dept 2005], lv denied 5 NY3d 853 [2005] [alleged victim was cousin of a staff member in the District Attorney’s office]; Matter of Morgenthau v Crane, 113 AD2d 20 [1st Dept 1985] [defendant’s cousin was one of nearly 270 Assistant District Attorneys and had no involvement with the case]; People v Malone, 46 Misc 3d 918 [Sup Ct, Queens County 2014] [complainant was uncle of an assistant district attorney, one of hundreds]; see also Matter of Columbia County Subpoena Duces Tecum Dated Mar. 20, 2013. [Czajka], 118 AD3d 1081 [3d Dept 2014] [that District Attorney may have acquired unspecified knowledge of interactions between Family Court and County Department of Social Services during prior tenure as a judge not a basis for disqualification]).
In People v Zimmer (51 NY2d 390 [1980]), the Court of Appeals held that the District Attorney should have been disqualified where he was counsel to, and a shareholder in, a corporation in the course of whose management the defendant was alleged to have committed the crimes charged. While there was no showing of actual prejudice, the conflict in this situation was readily apparent. The District Attorney had a financial interest in the corporation and, as counsel to the corporation, was its spokesperson in legal matters. There was, to put it plainly, a conflict between the role of a corporate attorney, representing one side of a controversy, and the role of the District Attorney. “No matter the good faith and complete integrity of the District Attorney, under these circumstances what impression could the defendant have had of the fairness of a prosecution instituted by one with the personal and financial attachments of this prosecutor?” (People v Zimmer, 51 NY2d at 395).
In People v Shinkle (51 NY2d 417 [1980]), it was held that the fact that the attorney who initially represented defendant and participated actively in the preparation of his defense became the Chief Assistant in the prosecutor’s office in the months before and during the trial should have resulted in the disqualification of the prosecutor’s office. WTiile no actual prejudice was shown, there was an appearance of impropriety and a continuing opportunity for abuse of confidences entrusted to the attorney by the defendant (People v Shinkle, 51 NY2d at 420-421).
*1010 Avoidance of the appearance of impropriety was also cited in People v Adams (20 NY3d 608 [2013]). There, the prosecutor informed defense counsel that, while a proposed plea bargain would be an adequate resolution in most cases, in this case, the prosecutor would not agree to the proposal because the complainant, a judge of the City Court in which the case was pending, was opposed to it and wanted a trial. While no actual prejudice was shown, and while a criminal defendant does not have a right to a plea bargain, “there is an unacceptably great appearance of impropriety — the appearance that the District Attorney’s office refused to accept a reduced charge because the complainant was a sitting judge who demanded that the matter go to trial, rather than because a trial was, in its own disinterested judgment, appropriate” (People v Adams, 20 NY3d at 613). Adams thus was “one of those rare cases in which a significant appearance of impropriety was created, requiring disqualification” (id.). It does not appear that the crux of the court’s decision was a finding of a cognizable conflict of interest; rather, it appears that the court viewed the case as involving a substantial risk of abuse of confidence.
In People v Nelson (167 Misc 2d 665 [Crim Ct, Kings County 1995]), the court denied an application to remove a District Attorney whose office had earlier unsuccessfully prosecuted the defendant for murder and who had petitioned the United States Attorney General for an investigation which led to federal charges against the defendant for the same conduct that had formed the basis of the state charges on which the defendant had been acquitted. While the case against defendant was unrelated to the prior incident, defendant maintained that the District Attorney had indicated that he would not offer defendant a plea bargain and that the District Attorney was engaging in an overzealous prosecution. The court viewed defendant’s argument as asserting that, because the District Attorney had been stung by adverse comment over the handling of the prior prosecution, the District Attorney was seeking retribution for the prior acquittal and personal political gain.
The Nelson court denied disqualification, finding that there was no evidence that the present prosecution was proceeding in bad faith and that, even assuming the truth of defendant’s assertions, there was no actionable conflict of interest (People v Nelson, 167 Misc 2d at 672-673). Further, there is no right to plead to a reduced charge and the District Attorney has discretion to offer or deny plea agreements (other than a plea to the *1011 entire accusatory instrument) (id. at 675). At most, the case involved a defendant who was acquitted in a controversial, unrelated matter three years earlier in circumstances that did not bespeak a forfeiture of objectivity by the District Attorney (id.; see also People v Williams, 37 AD3d 626 [2d Dept 2007] [first indictment dismissed for failure to disclose exculpatory evidence did not show “actual prejudice” requiring disqualification of prosecutor who obtained second indictment after the exculpatory material was turned over to defense]).
Three cases offer differing perspectives on aspects of the facts presented here.
In Matter of Soares v Herrick (20 NY3d 139 [2012]), the Court of Appeals held that it was error to disqualify the District Attorney on the basis of a civil lawsuit that defendants brought against him during the pendency of the criminal proceedings. In Soares, the underlying alleged criminal acts involved the illegal sale of steroids and other prescription drugs. The grand jury returned an indictment against defendants and then the District Attorney obtained successive superseding indictments. After the fourth indictment, the court granted dismissal and denied leave to re-present. The People appealed the dismissal and, while the appeal was pending, defendants commenced a civil action in federal court in Florida against the District Attorney and his staff, claiming that their constitutional rights had been violated. On the District Attorney’s appeal of the dismissal of the fourth indictment, the Appellate Division upheld dismissal but granted leave to re-present. The trial court granted dismissal of the ensuing fifth indictment with leave to re-present, but disqualified the District Attorney from further prosecution.
The Court of Appeals reiterated the rule that the existence of a conflict of interest between the District Attorney and the defendant is not, by itself, sufficient to warrant disqualification of the District Attorney in the absence of actual prejudice or a substantial risk of prejudice (Matter of Soares, 20 NY3d at 146). In Soares, there was no showing of any prejudice in connection with the fifth indictment, particularly since the charges contained therein were virtually identical to the charges contained in the fourth indictment, which had been obtained well before the civil suit was commenced (id.). The Court concluded that defendant’s reliance on the District Attorney’s “personal, professional and financial stake in the outcome of both the civil and criminal cases” involved only a claim of a *1012 potential for prejudice, short of the required showing of the sort of actual prejudice needed to obtain the exceptional relief of displacing an elected District Attorney (id. at 146-147). The Court was careful to refrain from holding that a civil lawsuit commenced by a criminal defendant against an elected district attorney would never warrant the district attorney’s disqualification; it held only that disqualification was not warranted on the facts presented.
Previously, the Court of Appeals declined, in Matter of Schumer v Holtzman, to reach the issue of whether a District Attorney should be disqualified on the basis of prior political differences with the subject of the investigation. In that case, Elizabeth Holtzman, the Kings County District Attorney, had previously been the holder of the congressional seat to which Charles Schumer had been elected. Newspaper articles appeared concerning Schumer’s allegedly improper use of public employees in his campaign. Holtzman, concerned that she might be accused of bias because of past political differences with Schumer and that some of her former congressional staff might be witnesses, decided to appoint a “Special Assistant District Attorney” with broad powers to control the investigation and prosecution. The trial court held that the appointment was void and that Holtzman was disqualified. The Appellate Division, while agreeing the appointment was void, held that Holtzman was not disqualified. The Court of Appeals ruled the appointment was void but also held that the lower courts should not have reached the issue of disqualification. The Court stated:
“The embarrassment of respondent Holtzman or the fact that she may be accused of a vendetta because of prior political differences are considerations which she must weigh in either proceeding with the matter herself or moving for the judicial appointment of a special prosecutor. They are not reviewable by the court in this proceeding, however, merely because the District Attorney has publicly expressed some anxiety over a possible appearance of impropriety. Similarly, it is not now apparent that her former employees will be implicated in the investigation, thus possibly forcing her to take inconsistent positions, or if so, whether the inconsistency would be disabling” (Matter of Schumer v Holtzman, 60 NY2d at 55-56).
A contrasting case, involving a different factual facet, is People v Gallagher (143 AD2d 929 [2d Dept 1988], lv denied 73 *1013 NY2d 891 [1989]). There, defendants were a detective and a police officer with the Suffolk County Police Department and were charged with crimes related to a false police department report. A New York State Temporary Commission of Investigation was investigating allegations of misconduct and deficient administration involving Suffolk County law enforcement officials. With respect to the charges at hand, the District Attorney had disqualified himself on the ground that he and members of his office were material witnesses. The court appointed Harvey Arnoff as Special District Attorney who decided to hire a detective assigned to the Suffolk County District Attorney’s Office. The Chair of the Investigation Commission wrote to the appointing judge to complain that Arnoff lacked prosecutorial experience and had hired an investigator from the same office that was involved in the investigation. The court then vacated the Arnoff appointment and appointed another Special District Attorney who obtained indictments of the defendants.
The Appellate Division ruled that it was proper for the court to have revoked the appointment of Arnoff, the initial Special District Attorney. Apart from the fact that the Chair of the Investigation Commission objected to the appointment, Arnoff s decision to hire a detective from the same office that he would be investigating created the same conflict that had precipitated the initial disqualification of the elected District Attorney. But there was more. The Second Department added:
“Moreover, the media provided widespread coverage of the feud between Arnoff and the Commission which ran the further risk of jeopardizing the public’s confidence in the investigation. Under the circumstances Justice Stark’s removal of Arnoff was as necessary to protect the public interest from ‘actual prejudice arising from a demonstrated conflict of interest or a substantial risk of an abuse of confidence’ ... , as was the disqualification of the Suffolk County District Attorney in the first place. Nor can it be said that the gravity of the potential for prejudice lessened because it might cut either or both ways against a defendant or against the People” (People v Gallagher, 143 AD2d at 932 [citations omitted]).
The Motion to Disqualify Should be Denied
The court now turns to the application of the legal principles to the facts at hand.
*1014 To begin with, the court concludes that defendant has failed to show that there is an actionable conflict of interest between himself and District Attorney Levy. While Levy has commenced a civil lawsuit against Sheriff Smith, defendant Castaldo is not a named defendant in that action. Levy named a number of “John Doe” defendants but his attorney has represented to the court in that case, in an affirmation submitted under penalty of perjury, that Castaldo is not one of the “John Doe” defendants and, further, “will not be individually substituted for one of the ‘John Does’ in this matter” (affirmation of Michael H. Sussman, Esq., dated Mar. 19, 2015, ¶ 7, annexed as exhibit I to affirmation of Andrew C. Quinn, Esq., dated Apr. 10, 2015). Although this falls a bit short of a Shermanesque disavowal of any intent on Levy’s part to ever sue Castaldo, the fact remains that Levy has not made any personal, civil claim against Castaldo. The fact that Levy is suing Castaldo’s former employer does not create a conflict with Levy’s role as Castaldo’s prosecutor.
Castaldo is unquestionably a witness in the Levy suit against Smith and, perhaps, in the Smith lawsuit against Levy. However, there is no suggestion that the present charges against Castaldo have any relationship to the subject matter of the civil litigation. While it will undoubtedly be disconcerting, and most unusual, for a criminal defendant to be questioned at a deposition or at trial by his prosecutor, there is no showing of any factual commonality between the events which form the basis for the indictment, which arise from an incident on July 3, 2014, and the events concerning the prosecution of Hossu, with his arrest in March 2013 and his acquittal on April 3, 2014.
Castaldo argues that Levy’s willingness to offer to allow Castaldo to plead to a reduced charge may be dependent on whether Castaldo testifies favorably to Levy’s position in the civil suit. While it is not unusual for prosecutors to accept a reduction (or even dismissal) of charges in exchange for a defendant’s cooperation, a defendant does not have the right to demand a plea reduction. The court will not accept the assumption implicit in Castaldo’s argument — that he would knowingly color his civil testimony in order to curry favor with Levy — and the court will not accept the corollary assumption— that Levy would knowingly elicit false testimony from Castaldo in the context of the civil case.
While Castaldo’s counsel contends that Levy has brought this case against Castaldo as retaliation for Castaldo’s involve *1015 ment in the Hossu case, no evidentiary support for that argument has been tendered. This court has not been provided with any information regarding the incident that underlies the indictment; indeed, the papers submitted did not contain a copy of the indictment itself. There is no information as to what, if any, investigation preceded the commencement of the prosecution; no information as to whether there is a complaining witness and, if so, his or her identity. Hence, there are no facts presented which would indicate that Levy instigated an investigation and prosecution on his own initiative. And, since the prosecution is by indictment, the court must, at present, presume that the grand jury determined that the evidence before it was legally sufficient to establish that Castaldo committed the crimes charged and that competent and admissible evidence before it provided reasonable cause to believe that Castaldo committed such offenses (see CPL 190.65 [1]).
The present case has its similarities to Soares, Schumer and Gallagher. Like Soares, it raises the issue of the tension created by the existence of civil litigation between the prosecutor and the defendant. Soares involved a civil case brought by the criminal defendant after the apparent resolution of the criminal matter. It clearly would be too facile to allow a criminal defendant to rid himself or herself of the elected prosecutor by simply bringing a civil case against the prosecutor. This case, however, involves the prosecutor’s voluntary (and, in this court’s experience, extraordinarily unusual) commencement of a private, civil action for damages against the County Sheriff, one of whose principal deputies is this defendant. On the other hand, and also unlike Soares, the civil litigation arises from an entirely different complex of facts than does the criminal case.
At bottom, because Castaldo is not a defendant in the civil case and because the matters are entirely unrelated, the court concludes that there is no actionable conflict of interest. If Castaldo is convicted in this case, Levy’s civil suit is neither advanced nor thwarted. Likewise, if Castaldo is acquitted, Levy’s civil suit is neither advanced nor thwarted. Whether Levy prevails in his civil suit has no impact on the outcome of this case. It would, of course, be different, if the criminal case arose from the same facts as the civil case, as a conviction could well have a significant impact on the civil case (see D'Arata v New York Cent. Mut. Fire Ins. Co., 76 NY2d 659 [1990]).
It is undeniable that there is a feud between the elected District Attorney of Putnam County and the elected Sheriff of *1016 Putnam County. It is unfortunate, if not unseemly, that this feud is now being played out in civil litigation between these two public officials, each seeking millions of dollars in damages against the other. The question is whether the existence of this feud presents a serious risk of jeopardizing the public’s confidence in the integrity and justice of this prosecution.
In Schumer, while the Court of Appeals declined to reach the issue, the Second Department concluded that the existence of a political feud between the District Attorney and her congressional successor was not sufficient to warrant the District Attorney’s disqualification. By contrast, in Gallagher, the Second Department concluded that the feud between Arnoff, the Special Prosecutor, and the State Temporary Commission on Investigation, which was also investigating the conduct of the Suffolk County Police Department, gave rise to the necessity of disqualifying Arnoff from the prosecution. In vacating the appointment of Arnoff, the trial court observed that it was necessary for the Special Prosecutor to cooperate with the Commission, and vice versa, because much of the evidence had been obtained by the Commission. Thus, the integrity of the investigation and prosecution was jeopardized by the feud between the outside prosecutor and the outside investigative agency. Moreover, the defendants in Gallagher were objecting to Arnoff s removal.
This case is different. There is no contention that the feud between the District Attorney and the Sheriff is threatening the viability of the prosecution; indeed, it is not even suggested that cooperation between those two officials and their offices is necessary to this prosecution. Moreover, removal of the District Attorney from this case is sought by Castaldo and not by an outside agency.
This court is not persuaded that any actual prejudice or harm has been shown by Castaldo. While defense counsel asserts that Levy shared grand jury information with Mr. Sussman, defense counsel has no direct evidence of that. Mr. Sussman denies any impropriety and points out his information was derived from other counsel.
There is at least some evidentiary support, in the form of Captain McNamara’s affidavit, for the claim that grand jury information was improperly disclosed by Levy’s publicist to the media. However, even assuming that Carter did give Milburn information (or failed to deny Milburn’s statements to her) regarding the pendency of an indictment against Castaldo and *1017 whether Schramek was a witness, such disclosure does not, by itself, reflect a conflict of interest on Levy’s part. It is unfortunately the case that grand jury information not infrequently comes to the attention of the media when it should not have. The information allegedly disclosed is not of such a nature and magnitude as to suggest that Levy knew about, much less authorized, the disclosure or that he did so in order to pursue a personal interest. Indeed, the fact of Castaldo’s indictment did become public information in a roughly contemporaneous period; the indictment is dated February 6, 2015 and Carter claims that her conversation with the reporter occurred on February 11, 2015.
While Levy may well have failed to mount an effective argument to preserve the Moten prosecution, he had the discretion, if not the ethical obligation, to assure that the arrest and prosecution of Moten were appropriate in all respects. This court cannot say, on the basis of the hearing transcript alone, that Levy was mistaken in his apparent doubts as to the actions of the Sheriffs officers in regard to the Moten matter, much less that his conduct of the hearing was prompted by a personal interest, as distinguished from an effort, as perceived by Levy in good faith, to promote justice through dismissal of a prosecution that he believed was unwinnable, or unwise, or unwarranted. While Castaldo suggests that Levy is out to embarrass the Sheriffs Department due to a political feud, the Moten transcript is, at best, equivocal and there is nothing to indicate that there is a widespread effort on the part of Levy or his office to embarrass the Sheriff or his Department in their every day law enforcement duties, i.e., no other case has been cited as involving an effort by Levy to torpedo a prosecution in order to advance a personal agenda.
This court is not without its concerns. It is unusual, to say the least, for a litigant in a civil case who is represented by counsel to seek to question witnesses personally, especially where that litigant is the District Attorney and the witness is a defendant being prosecuted for unrelated crimes by the District Attorney. These concerns are amplified by Levy’s apparent willingness to extend the scope of his inquiries beyond the immediate issues at hand, as he did in the Moten matter. But, in the end, these concerns can be readily addressed through appropriate applications to the judges presiding over these matters. If Levy’s (or Mr. Sussman’s) questioning of Castaldo in the civil case, either in deposition or at trial, presents concerns, *1018 Castaldo’s counsel may seek a protective order in discovery (see CPLR 3103) or raise objection to the scope of questioning at the civil trial. And the scope of any testimony to be elicited at the trial of this criminal case will be subject to the determination of the trial judge. Thus, Castaldo’s not unwarranted apprehension that Levy could seek to extend the scope of questioning in the civil case into areas germane to this case may be effectively addressed by the jurist presiding over the civil case, rather than by complete displacement of the District Attorney duly elected by the people of Putnam County to prosecute criminal offenses in that jurisdiction.
On this record, the court does not believe that this is one of the rare cases where, due to a demonstrated conflict of interest or substantial risk of an abuse of confidence, the authority of the elected District Attorney should be superceded.
Conclusion
For the reasons stated, it is hereby ordered that the motion by defendant Patrick Castaldo, made pursuant to County Law § 701 (1) to remove the Putnam County District Attorney from the instant prosecution and appointing a special district attorney shall be, and is hereby, denied.

 The undersigned has been periodically requested by the Putnam County District Attorney’s Office to appoint special district attorneys in cases in which that Office has disqualified itself voluntarily from participation. One such case was People v Hossu, in which the undersigned appointed the Westchester County District Attorney to conduct the prosecution upon the voluntary disqualification of the Putnam County District Attorney.